234 So.2d 303 (1970)
Clifford WILSON
v.
STATE of Mississippi.
No. 45711.
Supreme Court of Mississippi.
April 20, 1970.
Rehearing Denied May 11, 1970.
*304 Waller & Fox, Jackson, for appellant.
A.F. Summer, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., and Wade H. Creekmore, Jr. and James H. Creekmore, Sp. Asst. Attys. Gen., Jackson, for appellee.
PATTERSON, Justice:
Clifford Wilson was tried in the Circuit Court of Forrest County for the murder of Vernon Dahmer. He was found guilty and was sentenced to life imprisonment in the state penitentiary. He appeals from this judgment. We affirm.
Vernon Dahmer lived with his wife and three children in a rural community in Forrest County. In close proximity to his residence there was situated a small store owned by Dahmer, but occupied and operated by an elderly aunt.
In the early hours, about 2:00 a.m., of January 10, 1966, the Dahmers were sleeping in their residence. The widow of Dahmer testified that she was awakened by the sound of a car horn and gunshots coming into the house. Immediately thereafter she heard a window break and observed that the front portion of the house was on fire. She awakened her husband who helped her and the children out of the house and then returned the gunfire of the attackers.
The assailants departed shortly thereafter leaving the house and the store in flames, both of which were destroyed. Dahmer received burns in the fire from which he died later in the day.
T. Webber Rogers, a witness for the State, testified that he became a member of the White Knights of the Ku Klux Klan in 1965. He testified that the defendant Wilson was a member of the Klan and that he had attended Klan meetings with him, one of which was in the early part of December preceding the burning of Dahmer's property in January 1966. He testified that at this meeting the Dahmer project was mentioned in his presence and in the presence of Wilson by Cecil Sessum, the "Cyclops" of the Klavern. The project was referred to by the numbers "3" and "4" which were stated to mean "`3' is the number that's given on fire, and `4' is death." He stated that due to the lack of members in attendance the meeting was brief and soon adjourned.
Rogers further testified that he made a "dry run" by the Dahmer home and store with Cecil Sessum and Henry DeBoxtel, members of the Klan, but that he was not present the morning they were burned. He did not know whether Wilson made this "dry run," testifying that Wilson was not in the car with him.
The State's next witness was Billy Roy Pitts who was in the custody of a United States marshal at the time of the trial. As a preface to his evidence Pitts testified upon interrogation that he was a former *305 member of the White Knights of the Ku Klux Klan and that he had pled guilty to the murder of Vernon Dahmer and to the arson of his property; that he had been convicted of kidnapping in the Circuit Court of Jackson County and that he had been convicted in the Federal District Court on a charge of conspiracy arising from the Dahmer matter. Additionally, he had been convicted of grand larceny which was unrelated to the Klan activities. In the kidnapping trial, as well as in testimony given to a Jones County grand jury, the witness testified that he had no knowledge of the Dahmer project. He admitted on cross-examination that he had publicly stated to a church congregation, as well as to other public assemblies, that he had no knowledge of the Dahmer matter. He is, therefore, a confessed liar. In explanation of his repudiation of the former statements Pitts testified that upon joining the Klan he took an oath to obey all the laws thereof and that if any law was broken, it could be punishable by death. For this reason when he was ordered by Sam Bowers, the Imperial Wizard of the Klan, to deny publicly any knowledge of the affair in church and at subsequent public meetings, he did so.
The witness identified Wilson as an acquaintance and as a member of the Klan. Wilson was designated the "county investigator" whose duty it was to investigate the various projects of the Klavern for approval or disapproval.
The cogent portion of this witness's testimony is that on the night in question Sessum came to Pitts' home and directed him to obtain a gun and come with him. The witness did so and shortly thereafter joined a group of heavily armed Klansmen at the home of Sessum. Ammunition was distributed among the members and a number of plastic jugs were filled with gasoline. The men then left to accomplish their purpose of arson and murder. Pitts testified he traveled from this rendezvous to the Dahmer property in the blue Pontiac automobile of Wilson, the appellant. The automobile was driven by Wilson and the occupants other than the witness were Cecil Sessum and Bill Smith. The other automobile used on the project was a light-colored Ford. It was occupied by Henry DeBoxtel, Charles Nobles, Frank Lyons, and Lester Thornton and followed the car of Wilson.
Pitts explained that his duty in the project was to guard Sessum whose assignment was to throw gasoline into the house and ignite it after the "picture window" in the front of the home was shot out. Wilson was instructed by Sessum "* * * to get the vehicles under the carport of the Vernon Dahmer home, to put Molotov cocktails in them and shoot holes in the gas tanks and try to ignite the gas in the gas tanks of the vehicles." The automobiles first passed the property reconnoitering, returned, and the men got out and began firing their guns into the home. The action was described by the witness as follows:
Q. All right. You have your instructions now and your equipment. After you got your instructions, then what happened?
A. We went to the Vernon Dahmer home in Cliff Wilson's car and Henry DeBoxtel followed in the Ford car with his men, and as we turned into the driveway of the Vernon Dahmer house I looked back and saw that the Ford car turned in toward the store. It was close by the house.
Q. All right.
A. Then we all jumped out of the car real quick, out of the Cliff Wilson car and Bill Smith started shooting the picture window out of the house, out of the Vernon Dahmer home. Cecil Sessum took the jugs of gasoline and I ran with him to the front of the house. As I was running toward the front of the house Cliff Wilson was running toward the carport of the house.

*306 Q. What did he have?
A. He had two jugs of gasoline, a shotgun and a pistol.
Q. All right, and he was to take care of the cars?
A. Yes, Sir.
Q. All right. Then what happened there in front of the house?
A. Bill Smith had shot the window out in front of the house. Cecil Sessum uncapped the jugs of gasoline and took a pocket knife from his pocket and jobbed holes in the top of some of the jugs and he threw the jugs into the living room of the house, or in what I believed was the living room of the house.
Q. Did he throw them where this window had been?
A. Yes, Sir, and I had crotched down in front of the house next to the house while he was throwing the jugs of gasoline into the house. He had a gasoline soaked rag wrapped around a forked stick that he took and lit it, lit this torch that he had made, and throwed it into the house and ignited the gasoline.
Q. What happened when he threw that torch in there after that gasoline?
A. Huge flames of fire began roaring through the house.
Q. And then what happened, Pitts?
A. Then we ran back to the car and there was continuous shooting going on.
* * * * * *
Q. Was the Defendant Cliff Wilson, there?
A. He was.
Q. Did it happen in his presence?
A. It did.
As mentioned, the residence and store were totally destroyed.
The record reflects by the testimony of Pitts that the conspirators had agreed to leave the lights of their automobiles off until they departed, but someone in the Ford automobile turned the headlights on, whereupon some of the members fired upon it, deflating two of the tires. This automobile was later abandoned, all of the participants making their getaway in the automobile of Wilson. At this time Pitts discovered that he had lost his pistol at the scene of the fire and requested they return for it. This request was declined, however, as being too dangerous. The participants returned to the home of Sessum before disbanding. While there, Sessum directed DeBoxtel, in the presence of Cliff Wilson and the witness, to go to the Masonite plant and get word to Travis Giles, the owner of the abandoned automobile, to report it stolen the next morning since it had to be left on the side road.
The next witness for the State was J.B. Smith, a resident of the same community as Dahmer. He stated that he was awakened during the early hours of January 10 by an outside noise near his residence and that he went out to investigate the possibility that some of his cattle had escaped. While outside and near the road, he observed a light-colored car followed by a light blue car driving in the direction of the Dahmer home. It was his further testimony that later in the morning as he departed his home for a hunt, that he passed a light blue automobile parked on the east side of the road facing in the opposite direction from the Dahmer home. He stated that the car was unoccupied, but had the appearance of having been recently abandoned as it was still hot and steaming and that it had a flat tire.
The abandoned automobile was discovered the next day and identified as belonging to Travis Giles. A burned pistol later identified as belonging to Pitts was *307 found at the scene. Dahmer's automobile was consumed by fire, but his truck which was removed from the carport during the fire was intact. Upon examination of the truck it was discovered that the windshield and the rear window had been shot out; there were bullet holes in the lower back portion of the cab, and a plastic jug containing gasoline was in the bed of the truck. According to the testimony of Dahmer's widow this jug was not in the truck the preceding evening.
Wilson did not testify in his own behalf. His defense was an alibi, based upon his wife's testimony that he was at home with her the entirety of the night of the fire. She also testified that they had visitors in their home until about 11:00 p.m. who could corroborate the defendant's presence. Several witnesses of impeccable character gave evidence as to the good reputation of the defendant in the community in which he lived.
The jury by its verdict of guilty rejected the defendant's alibi and accepted the testimony of the State. There are numerous assignments of error on appeal, all of which are discussed, but not necessarily in the order presented.
The appellant argues that he should have been granted a change of venue due to the publicity given the Dahmer case by the news media. The motion for the change of venue was not in accord with the dictates of Mississippi Code 1942 Annotated section 2508 (1956) in that it was not supported by affidavits of two or more credible persons. This requirement is essential to the validity of the motion. Thompson v. State, 231 Miss. 624, 97 So.2d 227 (1957); and Purvis v. State, 71 Miss. 706, 14 So. 268 (1893). Nevertheless the trial court considered the motion and overruled it. Assuming, but not deciding, that the motion is now properly before the Court on review, we reach the conclusion, after due consideration of the newspaper articles introduced as exhibits, that the Hattiesburg and Forrest County area was not, at that time, so saturated with publicity unfavorable to the appellant that it was impossible for him to receive a fair trial. The same argument was propounded in Sessum v. State, 221 So.2d 368 (Miss. 1969), a companion case with regard to a continuance due to the alleged unfavorable publicity. The argument was rejected for the reason that we could not say that the trial court abused its discretion in denying the motion. Though the exhibits are more numerous than in the previous case, we are of the opinion that the news releases printed in July 1968 were not sufficiently direct or cogent at the time of the trial in January 1969, that they deprived the defendant of a fair trial as the result of their issuance. As stated in Sessum, supra, we find no abuse of discretion by the court in its denial of the motion.
The appellant also contends that the court erred in overruling his objection to the voir dire examination of the jury by the State. His contention is that the State prosecutor made every effort to prejudice and inflame the jury in the process of questioning prospective jurors. At one point in the examination, in reference to the question of whether or not the acceptance of money from the Federal Government by Pitts would influence their verdict, the following colloquy transpired:
Q. If you believed this defendant guilty of murder, would you vote guilty if you believed it beyond a reasonable doubt, even though Billy Roy Pitts, who is going to testify if he lives, received money?
An objection was made and overruled. Later in the voir dire examination the district attorney made the following statement:
Q. All right, now it will develop in this case, and I'll tell you right now, there's no question about it, that Billy Roy Pitts, Lord willing, will testify as a witness.
*308 An objection was interposed and arguments followed, whereupon the objection was sustained. The argument propounded by the defendant is that the reference to "if he lives" and "Lord willing" had the innuendo of inflaming the jurors against the Klan in general which would prejudice the defendant, a Klansman. We note that the defense attorney did not move to quash the jury panel after the court sustained his objection. Moreover, we are of the opinion this contention has little or no merit since the remarks are taken out of context and appear to be little more than everyday expressions not arising to prejudicial proportions. The appellant obtained the ruling he requested and since he made no request for a mistrial, he waived any further complaint as to the statements. Hyde v. O'Neal, 234 Miss. 112, 105 So.2d 553 (1958); Aldridge v. State, 180 Miss. 452, 177 So. 765 (1938); and Wells v. State, 162 Miss. 617, 139 So. 859 (1932).
It is next contended that the court erred in not sustaining the motion of the defendant for a mistrial based upon the absence of the district attorney. The record reflects that during the course of the trial the district attorney became ill and was unable to continue with the prosecution of the case. Upon objection being made to prosecution in his absence, the court ruled that the county prosecuting attorney, who had assisted in the trial from the beginning, should continue with the trial for the State. We find no error in this regard. Mississippi Code 1942 Annotated section 3924 (1956) provides, among other things, the following:
If at the time of impaneling the grand jury in any circuit court, the district attorney be absent or unable to perform his duties, or if after impaneling of the grand jury, the district attorney be absent or unable to perform his duties or be disqualified, the court shall forthwith appoint some attorney at law to act for the state in the place of the district attorney during his absence or inability or disqualification, and the person appointed shall have the power to discharge all the duties of the office during the absence * * *. (Emphasis added.)
See Carlisle v. State, 73 Miss. 387, 19 So. 207 (1896), wherein it was held that prosecution by private counsel with sanction of the court when all preliminaries to the trial requiring official action had been performed was proper. The intent of the legislature as expressed in the above section was to avoid the delay, burden and expense of an additional trial due to the absence of the district attorney. For this reason it commands the court to forthwith appoint an attorney to discharge the duties of the district attorney in his absence. We find no abuse of discretion by the court in appointing the county attorney to continue the trial since he is charged by law with the duty of assisting the district attorney in all criminal cases in the circuit court of his county. Miss.Code 1942 Ann. § 3916 (1956). We conclude that the appointment of the county attorney was not only authorized by law, but was the logical and appropriate thing to be done under the circumstances.
The wife of the defendant testified that he was at home the entirety of the night of the crime. She also testified that there were others present who could give evidence as alibi witnesses. It is now contended that the court erred in sustaining an objection of the State which was made when she attempted to explain the absence of these witnesses. Mrs. Wilson, after testifying that she and her husband were at home on the evening of January 9, gave the following testimony:
Q. And who was home or at your home?
A. Well, there was Clifford and me and the four children, and Mr. and Mrs. Darrell Atkins and Mr. Charles Buckley.
Q. Mrs. Wilson, do you know where Charles Buckley is?
A. No, Sir, I do not.

*309 Q. Have you seen him since that time?
A. No, Sir.
Q. Mrs. Wilson, do you know where Mr. and Mrs. Atkins are?
A. Yes, Sir.
BY MR. DUKES: (County Attorney) Objection.
BY THE COURT:
Well she can testify if she knows.
BY MR. DUKES:
Where they are now, Your Honor, is completely immaterial.
BY THE COURT:
Overruled.
Q. You may answer, Mrs. Wilson.
A. Mr. Atkins has a heart condition and could not come, and Mrs. Atkins is in 
BY MR. DUKES:
Object to that, Your Honor.
BY THE COURT:
Yes, I sustain, Just tell where they are if you know.
A. Well could I tell where she's at? I know where she's at.
BY MR. HAROLD MELVIN: (Defense Attorney)
Mrs. Wilson, I believe the Judge has ruled that you can't.
It is apparent that the trial judge did not preclude the appellant from testifying as to the whereabouts of other witnesses. The appellant's argument, being based upon a misconception of the record, is unavailing.
The appellant next protests the granting of several instructions for the State, one of which is as follows:
The Court instructs the Jury for the State that you do not have to know that the defendant is guilty of the crime charged in the indictment before you would be warranted in convicting him; all that the law requires is that you must believe from the evidence, beyond a reasonable doubt, that he is guilty of the crime charged, and if you so believe, then it would be your sworn duty to find the defendant guilty as charged.
We have criticized this instruction in the past, but have, nonetheless, approved it by holding it not to be reversible error. Graham v. State, 229 So.2d 548 (Miss. 1969); Byrd v. State, 228 So.2d 874 (Miss. 1969). We again approve somewhat ironically, that which we have heretofore criticized, but not yet condemned as being reversible error.
The next instruction assigned as error is one by which the State defined murder as the killing of a human being without authority of law, etc., and instructed the jury that if it believed from the evidence beyond a reasonable doubt that Wilson in company with others, having a common design to burn the Dahmer dwelling for the purpose of committing arson and "while so engaged, either with the formed purpose to kill the deceased, Vernon Dahmer, or without any such intent, and as a result of said alleged act of arson the deceased, Vernon Dahmer, died then the Jury should find the defendant guilty." The argument is made that the instruction is inartfully drawn and is incomplete in that it infers that arson was committed, but fails to charge it to have been done, and that the purpose of an instruction is to advise the jury to the applicable law as relating to a certain state of facts. The appellant cites no authorities condemning this instruction, and we find none from our investigation. To the contrary, the identical instruction was approved in Sessum, supra. We conclude that the instruction was not improper, in view of its recent approval and our present conclusion that it could not have misled the jury, particularly when viewed with the other instructions obtained by the State and the defendant.
*310 Complaint is made of State's Instruction No. 6 which, in its preface, "instructs the Jury for the State that any person or persons who aid, abet, or assist in the commission of a crime as charged in the indictment then such person is considered as a principal; and * * * if you believe from the evidence * * * beyond a reasonable doubt that the defendant * * * aided or abetted others in willfully, unlawfully, feloniously, and of his malice aforethought killing and murdering Vernon Dahmer * * * then you should * * *" The point raised by appellant is that the instruction is improper since it contains a reference to the indictment; citing Ellis v. State, 33 So.2d 838 (Miss. 1948). An examination of the case indicates that the instruction there determined to be erroneous did not within itself define the elements and nature of the crime charged. Instead, it relied totally on the indictment for a definition of the crime charged. The jurors were thus referred to and required to interpret the indictment themselves rather than being properly instructed by the court of the elements of the crime charged. The present instruction is not similar inasmuch as it defines the elements of the offense charged. The reference to the indictment is at most surplusage and was not prejudicial to the defendant. Shannon v. State, 237 Miss. 550, 115 So.2d 293 (1959).
The final instruction complained of is:
The Court instructs the Jury for the State that the testimony of an accomplice which is not unreasonable, improbable, unbelievable, or selfcontradictory is alone sufficient to sustain a conviction.
The complaint made of this instruction is that it ignores the conflicts in the State's testimony, singles out the testimony of Pitts, and when coupled with the bid for sympathy sought for Pitts plus the inflammatory and biased atmosphere of the court-room in which the trial was held, improperly influenced the jury to accept Pitts' testimony. We are of the opinion that the court erred in granting this instruction and we condemn its use in future criminal cases. However, we conclude that its present use did not have the dire effects as urged by defense counsel since the defendant obtained instructions relating to the caution and suspicion which jurors should have in mind in considering the testimony of an accomplice to a crime. Certain of these instructions are as follows:
The Court instructs the jury for the Defendant, Cliff Wilson, that if you believe from any fact in evidence that the witness, Billy Roy Pitts, is guilty of perjury in this case, or has sworn falsely to any material fact in this case, then you have the right under the law to disbelieve his testimony inasmuch as you are the sole judges of the weight, worth and credibility of the witness.
* * * * * *
The Court instructs the Jury for the Defendant, Cliff Wilson, that if you believe from the evidence in this case that the State's witness, Billy Roy Pitts, has been paid a sum or sums of money, or received any other consideration, directly or indirectly, from Agents of the Federal Bureau of Investigation, and if you further believe that said money or other considerations, if any, influenced his testimony, and that he has testified falsely about any material fact in this case, then you have the right to disbelieve his testimony in its entirety if you believe it untrue.
* * * * * *
The Court instructs the jury for the defendant, Cliff Wilson, that if you believe from any fact in evidence that the witness, Billy Roy Pitts, is guilty of perjury in this case or has sworn falsely to any material fact in this case, then you have the right under the law to disbelieve his testimony inasmuch as you are the sole judges of the weight, worth and credibility of the witnesses.

*311 * * * * * *
The Court instructs the jury for the defendant, Cliff Wilson, that the jury is the sole and only judge of the weight and worth of the testimony of Billy Roy Pitts, and each and every witness called to testify, and that you are the sole judges of the credibility of witnesses and in determining whether you will believe them or not, you have a right to consider the motives and interest of the witness, and nature of his testimony, and his demeanor on the witness stand and all facts in evidence throwing light upon the credibility of the witness and the weight and worth of his testimony.
* * * * * *
The Court instructs the Jury for the Defendant, Cliff Wilson, that if you believe from the evidence in this case that the State's witness, Billy Roy Pitts, has been paid a sum or sums of money, or received any other consideration, directly or indirectly, from agents of the Federal Bureau of Investigation, and if you further believe that said money or other consideration, if any, influenced his testimony, and that he has testified falsely about any material fact in this case, then you have the right to disbelieve any part of his testimony you believe untrue.
This assignment of error has caused the Court grave concern, but it is our opinion that the granting of this instruction does not constitute prejudicial error when considered, as it is a jury's duty to do, with the other instructions, including those outlined above.
The foregoing assignments are but preludes to the following and most serious question in the case: that the verdict of the jury is based solely upon the testimony of an accomplice which, it is argued, is uncorroborated, improbable, unreasonable, impeached, and contrary to the testimony of unimpeached witnesses. It is therefore contended the court should have granted a directed verdict for the defendant at the conclusion of the State's testimony and that the error arising from the court's refusal to do so was compounded by the court's refusing to grant a directed verdict at the conclusion of all of the testimony.
There can be no doubt that in our jurisprudence we follow the common law rule that the uncorroborated testimony of an accomplice will support a verdict of guilty. Hutchins v. State, 220 So.2d 276 (Miss. 1969). However, the rule is not without restrictions. In Hutchins we quoted with approval a statement from Cole v. State, 217 Miss. 779, 65 So.2d 262 (1953) as follows:
This Court has adopted a rule that a defendant can be convicted on the uncorroborated testimony of an accomplice, but it has carefully restricted the scope of that doctrine by holding that such uncorroborated testimony should be viewed with great caution and suspicion, and that it must be reasonable and not improbable or self-contradictory, or substantially impeached. * * * 217 Miss. at 785, 65 So.2d at 264.
We stated also that the uncorroborated testimony of an accomplice may be so thoroughly impeached that it amounts to no substantial evidence at all, citing Pegram v. State, 228 Miss. 860, 89 So.2d 846 (1956). The testimony of Pitts in our opinion is not so unreasonable, improbable or selfcontradictory that we can state as a matter of law that it should not be considered by the jury. The more serious question is whether the testimony of the defendant's wife as to the appellant's whereabouts on the night of the crime is of such force that it substantially impeaches the testimony of Pitts. The sordid reputation of Pitts is of record. The interest of the wife is apparent. Her testimony is unimpeached except by that of Pitts. The jury was properly instructed that his testimony must be viewed with great caution and suspicion. It was, of course, aware of the wife's interest. The jury being the sole judge of the weight *312 and worth of the testimony as its proper function, had before it the duty to determine the evidence it would accept as true and that which it would reject as untrue. Alexander v. State, 251 Miss. 847, 171 So.2d 517 (1965), and Bond v. State, 249 Miss. 352, 162 So.2d 510 (1964). It accepted the testimony of the State and on review we are of the opinion it was warranted in so doing, not only for the reason that the jury was instructed as to the caution it should use in considering Pitts' testimony, but for the additional reason there were physical facts, in our opinion, to corroborate his testimony. For example, Pitts testified that he lost his pistol at the scene of the fire and this weapon was found there the following morning by the law enforcement officers. Additionally, Pitts testified that the defendant was assigned the project of burning the Dahmer vehicles by throwing gasoline on them and by shooting into the gas tanks. The following morning Dahmer's truck was found to have bullet holes in the rear of the cab near the gas tank, with a plastic jug containing gasoline in its bed. These facts corroborate the testimony of Pitts to some extent, we think, and the jury could logically determine from this and the other evidence that the defendant was an active participant in the crime from which Dahmer's death resulted.
We have considered the numerous cases cited by the appellant in support of his theory that the testimony of Pitts was so impeached that it amounted to no testimony at all. In sum, they reiterate the rule announced above, but are distinguished from the case at hand in that the impeachment in each of those instances was much stronger, either by disinterested witnesses or supported by physical facts, than the case presently before us. They are, in fact, authority for the proposition that in this type of case the court must of necessity review the evidence considered by the jury on a case-by-case basis and that no standard has yet been established by which a jury or a court of law can with exactitude declare certain testimony to be either impeached or unimpeached.
In conclusion, we feel constrained to state that this case has given the Court much concern, particularly in view of the defendant's previous good reputation. However, we are of the opinion that the Court should not disturb the jury verdict since there was evidence to support it and since we find no prejudicial error in the record.
Affirmed.
All Justices concur.