328 So.2d 355 (1976)
John Reed SAUCIER
v.
STATE of Mississippi.
No. 48924.
Supreme Court of Mississippi.
March 9, 1976.
*356 Jimmy D. McGuire, Gulfport, for appellant.
A.F. Summer, Atty. Gen. by Pete J. Cajoleas, Special Asst. Atty. Gen., Jackson, for appellee.
Before GILLESPIE, SMITH and ROBERTSON, JJ.
SMITH, Justice:
John Reed Saucier was convicted in the Circuit Court of the First Judicial District of Harrison County of the murder of Earl W. Phillips, Sr., a Harrison County patrol *357 officer. For his offense he was sentenced to life imprisonment in the penitentiary. He appeals.
Four propositions are assigned as having constituted prejudicial error requiring reversal.
Dealing first with Saucier's motion for change of venue, the record reflects that there was a direct conflict in the evidence as to whether the defendant could or could not receive a fair and impartial trial in Harrison County. The trial court, after considering this evidence, as well as the answers of the members of the special venire given upon their examination on voir dire, found that there was no such prejudice against the defendant in Harrison County that he could not receive a fair and impartial trial. The trial court did not abuse its discretion in so finding or in overruling the motion for a change of venue. The action of a trial court in denying a motion for change of venue will not be reversed unless it is made to appear that there has been a clear abuse of discretion. Parks v. State, 267 So.2d 302 (Miss. 1972), cert. denied 411 U.S. 947, 93 S.Ct. 1923, 36 L.Ed.2d 408; Tarrants v. State, 236 So.2d 360 (Miss. 1970), cert. denied 401 U.S. 920, 91 S.Ct. 907, 27 L.Ed.2d 823; Slyter v. State, 246 Miss. 402, 149 So.2d 489, 150 So.2d 528 (1963); Anderson v. State, 246 Miss. 821, 152 So.2d 702 (1963).
It is contended on behalf of Saucier that the trial court committed reversible error in overruling a motion for a mistrial made after the jury had been selected and the trial of the case on the merits was about to begin. The voir dire examination of prospective jurors is ordinarily not reported in this state except where specially rquested. The examination of members of the special venire was not reported and, therefore, does not appear in the record. When the motion for a mistrial was presented to the trial judge on the eve of the trial, at the request of appellant's counsel the reporter read back the remark made by the District Attorney to the judge in the course of the voir dire examination which is the basis of appellant's motion. From this it appears that, at some point in the course of his examination of the prospective jurors the District Attorney addressed the court as follows:
May I take exception to the Court's ruling because I feel that it is important that the testimony and appearance of the Defendant will show. I don't want some Juror who would believe the State's case, but because of his age could find him guilty. I think I would be entitled to know if we have someone on the Jury like that. I would not like someone like that sitting on the Jury who may believe that the Defendant is guilty, but could not find him guilty because of his age.
It appears that, at the time the remark was made, an objection was interposed by appellant to this statement and the objection was sustained. It does not appear upon what ground the objection was made at that time. Nor does it appear that appellant, after his objection had been sustained, thereupon moved to quash the venire panel or for a mistrial upon the ground that reference to appellant's "testimony" was a forbidden comment upon appellant's failure to testify, an event which only developed later on when the case was tried.
This Court can act only on the basis of the contents of the official record, as filed after approval by counsel for both parties. It may not act upon statements in briefs or arguments of counsel which are not reflected by the record. Therefore, we are unable to say that appellant, after his objection had been sustained by the trial court, took any further action at that time, either by moving to quash the venire or for a mistrial.
The motion for a mistrial, based upon the incident, which occurred on voir dire examination of the venire, and not presented until a jury had been selected, *358 impaneled and sworn, the parties and attorneys were present, the witnesses for both sides were in attendance and the trial was about to begin, came too late. A party may not wait until a jury has been actually impaneled and, if he does not like it, obtain a mistrial on the basis of an incident of this kind which had occurred on voir dire examination of the panel. We are unable to say, from the meager report of the alleged incident which was inserted in the record, in what context the remark of the District Attorney was made. In any event, appellant's objection having been sustained (on whatever ground was then assigned, if any), it was necessary that he immediately move to quash the venire or for a mistrial, if he regarded the sustaining of his objection insufficient to remove any supposed harmful effect which may have resulted from the District Attorney's remark to the court. Wilson v. State, 234 So.2d 303 (Miss. 1970).
In Wilson, supra, this Court said:
Later in the voir dire examination the district attorney made the following statement:
Q. All right, now it will develop in this case, and I'll tell you right now, there's no question about it, that Billy Roy Pitts, Lord willing, will testify as a witness.
An objection was interposed and arguments followed, whereupon the objection was sustained. The argument propounded by the defendant is that the reference to "if he lives" and "Lord willing" had the innuendo of inflaming the jurors against the Klan in general which would prejudice the defendant, a Klansman. We note that the defense attorney did not move to quash the jury panel after the court sustained his objection. Moreover, we are of the opinion this contention has little or no merit since the remarks are taken out of context and appear to be little more than everyday expressions not arising to prejudicial proportions. The appellant obtained the ruling he requested and since he made no request for a mistrial, he waived any further complaint as to the statements. Hyde v. O'Neal, 234 Miss. 112, 105 So.2d 553 (1958); Aldridge v. State, 180 Miss. 452, 177 So. 765 (1938); and Wells v. State, 162 Miss. 617, 139 So. 859 (1932). (234 So.2d at 307-308).
If it should be supposed that some member of the venire heard the District Attorney so address the court, and later on became a member of the jury, it does not appear that the remark, under the circumstances, was so prejudicial as to have required that the venire be quashed or a mistrial entered. When a motion for a mistrial finally was presented, the trial court's offer to instruct the jury for the purpose of removing any possible harm which might have been occasioned by the remark, was declined.
It is next contended that Saucier's confession was improperly admitted into evidence; that the verdict of the jury was not based upon nor supported by competent and credible evidence but was against the overwhelming weight of the evidence on the issue of Saucier's sanity, it being appellant's contention that the State failed to establish his sanity beyond a reasonable doubt.
The record reflects that, at the time of the homicide, Saucier had a poor school record and had dropped out after completing the eighth grade. He had a high temper and various conflicts with his father. His IQ was rated at 102. He had enlisted in the Army when he was seventeen years old and at the time of the homicide was AWOL. He said that he had been assigned to the "Rehab" Company, explaining that this assignment had been made because he had "a profile of bronchitis." After going AWOL, he returned to the community where his father and mother lived, driving an automobile which he said he had borrowed from another soldier, who *359 was also AWOL. Prior to shooting the patrolman, Saucier went about in this automobile wearing a black wig.
At some time before the date on which the homicide occurred, Saucier had learned that Patrolman Phillips, the victim of the shooting, had been inquiring about an automobile roughly answering the description of the one he was driving. He stated to an acquaintance that if Patrolman Phillips tried to stop him that he would kill him. He also made the statement that if any officer tried to stop him that he would kill the officer.
On the day Patrolman Phillips was killed he passed the automobile of appellant. He immediately turned the patrol car around, apparently to follow Saucier, and Saucier speeded up and sought to escape. However, Saucier lost control of the car and wrecked it. Phillips came up to where Saucier's car was off the road and stopped and got out of the patrol car. As he started around the patrol car Saucier took a shotgun out of his car, loaded with Number 1 buckshot, and at very close range shot Phillips in the abdomen, all of the buckshot taking effect. From this wound Phillips shortly died.
As Phillips lay on the ground dying, Saucier got in the patrol car and fled the scene. Later on he "ditched" or hid the patrol car and started through back ways to the home of his parents. Before he reached their home he took off his wig, a red shirt that he was wearing, (because it was conspicuous or noticeable), and certain identifiable boots, and hid these articles together with the shotgun, across the street from his parents' home. He entered his parents' house through a window and said that it was his intention to call the sheriff and to report that his automobile had been stolen. It was unclear, however, whether he actually did this or not.
After he was apprehended by the officers he was handcuffed, given his Miranda warnings, and was being taken to jail when his father appeared and had a conversation with him while he was in the patrol car. In the course of this conversation the father told his son that if he had committed the crime to tell the officers about it.
After arriving at the jail, Saucier's "Miranda rights" were again read to him and at this time he elected to give a statement to the officers. There was an objection to the introduction of this statement into evidence and a motion was made to suppress it.
The interrogation of Saucier by the officers and his answers, were recorded on video tape. In his statement Saucier admitted having shot Phillips with the shotgun and sought to explain the shooting by saying, in effect, that he thought Phillips was drawing his gun and that the shotgun "went off." The record does not show that Phillips was armed at the time.
During the course of the examination of Saucier and the giving of his statement Saucier showed signs of being remorseful, cried from time to time, and expressed contrition, saying that he wished that it were he that had been killed rather than Phillips. After the statement had been transcribed, after 10:00 o'clock the following night, the exact time not being shown, Phillips signed the transcription of his statement.
An evidentiary hearing was conducted upon Saucier's motion to suppress. It is not contended that Saucier was mistreated or abused or that any improper inducement or promise was made or offered. Saucier was arrested in the late afternoon or early evening of the night of the same day on which Phillips was killed. The questioning began at about 8:45 on the night of his arrest and was concluded in less than an hour, that same evening.
Saucier elected not to testify on the motion to suppress nor did he testify upon the trial of the case upon the merits. However, it is objected that his confession *360 was not admissible because he had not had his rights explained to him as required in Miranda. The evidence on this point was quite strong to the effect that he had been twice informed as to these rights prior to any interrogation. It is contended that Saucier was incapable of giving a voluntary statement. However, Saucier was seventeen years old, had completed the eighth grade in school and a month after his arrest a psychological evaluation revealed that he had an IQ of 102 and was of normal intelligence. A psychiatric examination conducted about a month later also revealed that he was of normal intelligence. The trial court was justified in finding that Saucier's rights had been explained to him before interrogation as required by Miranda, that he voluntarily and understandingly executed a waiver and consented to being questioned, although he was in a remorseful state and cried from time to time during the questioning. Stewart v. State, 273 So.2d 167 (Miss. 1973).
Finally, the defense of insanity having been raised, Saucier challenges the sufficiency of the evidence to establish that he had been sane and had known right from wrong at the time he killed Patrolman Phillips. Two psychiatrists appeared and testified in Saucier's behalf. In the course of their testimony these experts gave opinions that Saucier was psychotic. They said that, in their professional opinion, Saucier had been, at the time of the homicide, unable to appreciate the nature and consequences of his act or to know that in killing Phillips he was doing wrong. One, however, on cross-examination, did state that if Saucier had been confronted immediately after killing the officer and had been asked, he would have said that what he had done was wrong. The State offered one psychiatrist who testified that appellant had not been insane and had known the difference between right and wrong and had known that in slaying the officer he was doing wrong. The trial court properly submitted the defense of insanity to the jury on instructions granted at the request of appellant as well as the State. No objection or criticism as to the form or content of any instruction was or is made.
This Court has held that where the defense of insanity is interposed in a criminal case the jury, in deciding the issue, is not restricted to a consideration of the testimony of experts only but may and should take into consideration all facts and circumstances in evidence touching upon or relevant to the issue, including evidence as to the conduct and actions of the accused before, at the time of, and after the commission of the act. In the case of Smith v. State, 245 So.2d 583 (Miss. 1971), the Court said:
The thrust of appellant's argument on this point is that the jury was bound to accept the expert opinions of the two psychiatrists who testified for him upon the issue of insanity. The opinions of these experts were, of course, competent and relevant to the issue. However, uncontradicted evidence before the jury acquainted the jurors with the conduct of the appellant before, at the time of, and subsequent to the homicide... . It was the prerogative of the jury, and it was its duty, to consider all of this evidence. The jury was not deprived of the right to use common sense or of applying the lessons of human experience in resolving the question of whether the appellant had or had not appreciated the nature and consequences of his act and had or had not known that it was wrong. The expert opinions of the psychiatrists were not conclusive upon that issue. (245 So.2d at 585).
In this case it is undisputed that Saucier had stated that he would kill Phillips or any officer who attempted to stop him. He prepared to carry out this threat by placing a shotgun in his automobile loaded with Number 1 buckshot. He was AWOL from the Army and had a reason for wishing to avoid officers of the law. When he observed Patrolman Phillips turn around and begin following him, he put on speed and attempted to escape by flight. *361 This resulted in the wrecking of his automobile. When Phillips arrived at the scene Saucier took the shotgun, with which he had prepared himself, out of his car and shot Phillips at close range, although it does not appear from the record that Phillips was armed at the time. This was exactly what Saucier had stated that he would do. He left Phillips on the ground dying, took the patrol car and fled in it from the scene. Afterward, he ditched the patrol car or hid it, removed his conspicuous, bright colored shirt, his boots (which were unusual and identifiable) and his wig, and hid them. In his statement, he said that he had planned to call the sheriff's office and to report that his car had been stolen. In his confession he attempted to justify his act by saying that he thought Phillips was about to draw his gun and that his shotgun had just gone off. In deciding the issue of insanity in this case the evidence was sufficient to present an issue of fact for determination by the jury and was sufficient to justify the jury's conclusion that Saucier was sane as reflected by the verdict of guilty.
There is no contention that Saucier did not shoot and kill Phillips. That he did so was conceded in the oral argument of the case. We find nothing in the record to support a contention that anything occurred in the course of Saucier's trial of so prejudicial a nature as to require a reversal of his conviction. The evidence is clear and convincing that the killing of Phillips by Saucier was premeditated and planned, that Saucier's actions following the shooting strongly indicate a perfect knowledge and understanding on his part that he had done a grievous wrong, and, in fact, had committed a serious crime. The case must, therefore, be affirmed.
AFFIRMED.
GILLESPIE, C.J., PATTERSON and INZER, P. JJ., and ROBERTSON, SUGG, WALKER and BROOM, JJ., concur.