IRVING, J.,
for the Court.
¶ 1. Senica Matthew Franklin was convicted by the Harrison County Circuit Court of two counts of murder and one count of arson. He was sentenced to serve a life sentence for each of the murder convictions and twenty years for the arson conviction, with the sentences to run concurrently. Aggrieved, Franklin appeals and asserts: (1) that the trial court erred in failing to grant his motion for a new trial, (2) that his trial attorney was ineffective, (3) that the trial court erred in refusing to grant his proposed circumstantial evidence jury instruction, and (4) that he was denied the right to confront a witness against him.
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. On the night of October 31, 2001, police discovered the charred bodies of Brenda Mason and Ronald Brock in Mason’s home located on Texas Avenue in North Gulfport, Mississippi. Mason and Brock had been shot, and Mason’s home had been set on fire. Almost three years later, Franklin was formally charged with two counts of murder and one count of arson. Franklin was tried three times before he finally was convicted on March 8, 2007.
¶ 4. Tosha Johnson testified that on October 31, 2001, she was walking north on Texas Avenue when Franklin came running toward her. According to Johnson, Franklin was running from the direction of Mason’s house. Johnson testified that she asked Franklin why was he running and that he responded, “because I’m running.” Johnson also testified that Franklin told her that she had “better go” and that she did just that. Johnson later testified that Franklin was walking fast, rather than running, when she encountered him. Initially, Johnson stated that she did not remember having any further conversation with Franklin. However, after being presented with a statement that she had previously provided to police, she remembered that Franklin had told her that there were two people in the burning *510 house.[1] Johnson remembered that Franklin was wearing black clothing.
¶ 5. Michael McCoy, a firefighter with the Gulfport Fire Department, recalled that when he arrived at the scene, the house was almost “fully involved” and that fire and heavy smoke were coming from most of the windows and eaves of the house. McCoy testified that he discovered two bodies that were so severely burned that he was unable to determine whether the victims were male or female.
¶ 6. David Dry, a deputy state fire marshal, also arrived at the scene while the fire was still in progress. He testified that while reconstructing the crime scene, he determined that the fire began in a “room inside the front porch.” Dry determined that the fire was “incendiary in nature, which is a fire set by human hands under circumstances which the person knows it should not be set.” Dry testified that he, along with other firefighters, collected seven samples and that they all came back negative for accelerants. Dry quickly pointed out that simply because acceler-ants were not found does not mean that accelerants were not in fact used. According to Dry, there are two equally plausible explanations as to why an accelerant was not found: the lab equipment may simply have been unable to detect one, or the accelerant may have been washed away by the water that was used to extinguish the fire.
¶ 7. Next, the State called Grady Sum-rail who testified that he, a female named Dusty, and Franklin were riding around on the day of the murders. Sumrall stated that early that day, they saw Mason at a local store. According to Sumrall, he witnessed Franklin and Mason engage in a discussion, but Sumrall claimed that he did not know what the discussion was about. Sumrall testified that Franklin mentioned that Mason owed him money but that Franklin did not mention anything about collecting the money from Mason. After being shown a statement that he had previously made, Sumrall remembered that Franklin had said, “I got to do Brenda [sic] something about my money.” However, Sumrall explained that this was merely a figure of speech. Sumrall also stated that, at some point throughout the course of the day, he observed that Franklin had a .380 caliber handgun in his waistband.
¶ 8. The State then called Billy Patton and Christopher Thompson. Both men grew up with Franklin and were incarcerated at the federal penitentiary in Oakdale, Louisiana at the time of Franklin’s trial.[2] Prior to going to the federal penitentiary, Patton and Thompson served time in the Harrison County Jail at different intervals, and during each of the intervals, Franklin was also incarcerated.
¶ 9. Patton testified that while they were incarcerated at the Harrison County Jail, he and Franklin were roommates in the same cellblock. Patton further testified that during this incarceration, he and Franklin talked from time to time over the course of about six months and that Franklin told him what had happened on the day of the murders. Patton recalled that Franklin told him about a heated conversation that Franklin had had with Mason on the day of the murders at a house located across the street from Mason’s house. Patton testified that Franklin told him that he went home after the *511 conversation. However, according to Patton, later that day, Franklin went to Mason’s house, shot Mason and Brock with a .380 caliber handgun, and set the house on fire. Patton stated that Franklin then went to Franklin’s apartment in the Ash-ton Park Apartment complex, which is located approximately five minutes from Mason’s house. Patton recalled that Franklin told him that he had thrown the gun in a septic tank that was located on the side of Mason’s house. The prosecutor asked Patton if he, prior to trial, had informed anyone in an “official capacity” of what Franklin had told him. Patton responded that he had told Terry Davis, a federal agent, after Davis approached him and asked him whether he knew anything about the murders.
¶ 10. Thompson testified that he was headed home at either a quarter to six or a quarter to seven on October 31, 2001, when he saw Franklin, who, he recalled, was wearing a black hooded jacket and jeans. According to Thompson, Franklin was looking at smoke that had formed in the sky.[3] Thompson stated that Franklin flagged him down and told him that he wanted to pay him what he owed. In order to facilitate the payment, Thompson stated that Franklin got into his vehicle. Thompson testified that it was at that point that he noticed a chrome .380 caliber handgun on Franklin’s side. Thompson stated that Franklin exited Franklin’s vehicle a short while later and that he did not see Franklin again that night.
¶ 11. At some point later, however, Thompson and Franklin served time together at the Harrison County Jail and were incarcerated in the same cellblock. Thompson testified that Patton was not at the jail during the period of time that he and Franklin shared the cellblock together and denied speaking with Patton before Thompson entered the jail. Thompson also testified that Franklin did not discuss anything that had happened on the night of the murders but that Franklin did mention to him that Mason owed him money and that, as a result, he and Mason got into a “heated conversation.”
¶ 12. At some point thereafter, Thompson was transferred to the federal penitentiary in Oakdale, Louisiana. It was at this point that Thompson came into contact with Patton. In 2004, Thompson told Craig Petersen, a lieutenant with the Gulf-port Police Department (GPD), what he knew about Franklin’s involvement in the murders after Lieutenant Petersen called the prison to speak with him about things that had transpired while he was in the Harrison County Jail.[4]
¶ 13. Reginald Merritts testified that shortly after he arrived home around sunset on October 31, 2001, Franklin approached him and asked him to give him a ride to an apartment complex near the airport.[5] Merritts stated that he agreed, and his girlfriend rode along. According to Merritts, as they made their way down the street, his girlfriend noticed that something was on fire on the street that Mason lived on. Merritts recalled that the street was cordoned off and that fire trucks and police were on the scene. Merritts stated that he then dropped Franklin off at the apartment complex.
¶ 14. Merritts was incarcerated at the Harrison County Jail after being arrested on September 19, 2002. Merritts testified *512 that, during that time, Franklin was also incarcerated at the Harrison County Jail. Merritts recalled an occasion when Franklin “rapped” about the murders of Mason and Brock. Merritts testified that when he asked Franklin if he had been involved in the murders, Franklin responded that he had. When asked whether Franklin admitted shooting and killing Mason and Brock, he replied: ‘Tes, he had said that he shot her.” Merritts also testified that Franklin then asked him what would it take for a person to be convicted of murder if no murder weapon is found.
¶ 15. Dr. Paul McGarry, a forensic pathologist, performed autopsies on Mason and Brock and concluded that they died of gunshot wounds to the head. Dr. McGar-ry also noted that Mason and Brock were shot at contact range and that the bullets that were recovered were consistent with a bullet fired from a .380 caliber handgun. According to Dr. McGarry, both Mason and Brock were killed before their bodies were set on fire,
¶ 16. Charles Bodie Jr., a sergeant with the GPD and head of the department’s crime scene unit and evidence room, testified that after arriving at the scene, he recovered four spent .380 shell casings. He also recovered plastic gasoline containers from Franklin’s residence.
¶ 17. Lieutenant Petersen testified that he took over the case in October 2003. During the course of his investigation, Lieutenant Petersen interviewed Patton, Thompson, and Merritts and verified that each of them had been incarcerated at the Harrison County Jail during the period of time that each claimed to have been. He also verified that during their incarceration they served time in the same area as Franklin. Additionally, Lieutenant Petersen testified that he, along with other officers, interviewed Sumrall on November 2, 2001. During his interview, Sumrall stated that he had seen Franklin on the night of the murders and that Franklin had a “chrome” .380 caliber handgun on his person. At the conclusion of the interview, Sumrall was shown a photographic lineup wherein he positively identified Franklin.
¶ 18. The defense presented three witnesses: Ruby Brock (Brock’s mother), Kevin Keys, and Anthony Shade. Ruby testified that on the night of October 31, she passed by Mason’s house between 7:05 and 7:10 and witnessed three men, whom she did not recognize, sitting on the porch.
¶ 19. Keys testified that in either June or July 2002, while he was incarcerated in the Harrison County Jail, he witnessed a verbal altercation between Franklin and Patton over Ayana Hawthorne, a woman with whom Patton has a child.[6] Keys stated that this relationship was a source of conflict between Franklin and Patton.
¶ 20. Shade, who had given a statement to the police on June 3, 2004, testified that he, Franklin, and a person whom he identified as “John John” were standing on a street corner on October 31, 2001, at approximately 7:00 p.m. Shade recalled that Franklin and “John John” left approximately forty-five minutes to an hour later. Shade further recalled seeing smoke and fire on Texas Avenue around 8:30 p.m., which he stated was approximately thirty minutes after Franklin left his company.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Denial of the Motion for a New Trial

¶ 21. In his first issue, Franklin claims that the trial court erred in refusing *513 to grant his motion for a new trial. Specifically, Franklin contends that the verdict is against the overwhelming weight of the evidence and asserts: (1) that “there [is] no physical evidence, forensic or otherwise” that links him to the crime, (2) that a witness gave testimony that was inconsistent with the witness’s testimonies at Franklin’s previous trials, and (3) that the “jailhouse-sniteh” testimonies offered by the State were unreliable. “A motion for a new trial challenges the weight of the evidence.” Foster v. State, 919 So.2d 12, 16(¶ 20) (Miss.2005) (citing Sheffield v. State, 749 So.2d 123, 127(¶ 16) (Miss.1999)).
¶ 22. “[An appellate court] will disturb a jury verdict only when ‘it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.’ ” Brown v. State, 970 So.2d 710, 713(¶8) (Miss.2007) (quoting Bush v. State, 895 So.2d 836, 843(¶ 18) (Miss.2005)). “[An appellate court] acts as a ‘thirteenth juror’ and views the evidence in the light most favorable to the verdict.” Id. (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)).

a. Lack of Physical Evidence

¶ 23. To support his lack of evidence argument, Franklin points out that none of the samples collected from the scene revealed that any accelerant had been used in the fire. Franklin also points out that Deputy State Fire Marshal Dry could not determine exactly what had caused the fire. It is true that Dry could not state conclusively what had caused the fire. However, he concluded that the fire was “incendiary in nature, which is a fire set by human hands under circumstances which the person knows it should not be set.” Dry also stated that even though no accel-erant was found, one should not conclude that an accelerant was not used.
¶24. Franklin also argues that none of the evidence collected by the officers connected him to the crime. Further, he notes that although several handguns were recovered, none were determined to be the murder weapon and that none of the guns that were found matched any of the projectiles that were recovered from the bodies of Mason and Brock. Franklin correctly states that several items, which were recovered or collected in the course of the investigation, did not connect him to the murders. However, there was other evidence in the way of testimonies from witnesses that did. The jury heard all of the testimony given during the trial and concluded that Franklin was guilty even though no physical evidence linked him to the crime. “The jury being the sole judge of the weight and worth of the testimony as its proper function, had before it the duty to determine the evidence it would accept as true and that which it would reject as untrue.” Wilson v. State, 234 So.2d 303, 311-12 (Miss.1970) (citing Alexander v. State, 251 Miss. 847, 855, 171 So.2d 517, 520 (1965)). There is no requirement that a criminal conviction must always be based on physical evidence.

b. Inconsistent Testimony of a Witness

¶ 25. Franklin argues that the testimony of one of the witnesses is unreliable because it conflicts with testimony that was given by the witness at Franklin’s previous trials. The remedy for this situation would have been to impeach the witness during the trial. Franklin failed to do so. Therefore, he cannot now complain. A jury is entitled to consider the testimony of all witnesses, even if a witness’s testimony conflicts with the witness’s previous testimony on a particular matter. See Hartley v. State, 161 Miss. 667, 670, 137 So. 518, 519 (1931).

*514
a Inmate Testimony

¶ 26. Franklin argues that the testimonies of Patton, Thompson, and Merritts are unreliable because they are the testimonies of “jailhouse snitch[es].” He cites cites Moore v. State, 787 So.2d 1282 (Miss.2001) to support his argument. In Moore, the Mississippi Supreme Court recognized that “[jailhouse-snitch testimony] is ‘becoming an increasing problem in this state, as well as throughout the American criminal justice system.’ ” Id. at 1287(¶ 15) (quoting McNeal v. State, 551 So.2d 151, 158 (Miss.1989)). The defendant in Moore requested an instruction that advised the jury to weigh the testimony of a jailhouse snitch “with great care and caution and [to] look upon it with distrust and suspicion.” Id. at 1286(¶ 13). The trial court refused to grant such an instruction. Id. at 1287(¶ 16).
¶ 27. On appeal, the Mississippi Supreme Court reversed, holding as follows:
In view of our position on the unreliability of jailhouse informant or “snitch” testimony, we do not agree that [the instruction offered by the State] adequately instructed the jury on the weight to be given to [the jailhouse snitch’s] testimony. For the foregoing reasons, this Court finds that the trial court erred in refusing jury instruction D-24[7] and that it was an abuse of discretion to deny Moore a cautionary instruction in the face of evidence that [the jailhouse snitch] may have received favorable treatment in exchange for his testimony.
Id. (footnote added). We find that Moore is distinguishable for two reasons: first, Franklin did not request a cautionary instruction, and second, there is no evidence that either Patton, Thompson, or Merritts received or was promised anything in exchange for his testimony. While Patton admitted that he had received a reduction of his federal sentence in exchange for the favorable testimony that he had given in a federal case, he made it clear that he had neither received, nor been promised, any favorable treatment in exchange for his testimony in Franklin’s case, although he said he hoped that he would.
¶ 28. Thompson was asked on direct examination whether he had been “promised anything in return” for statements that he had given to police. He responded that he had not. Thompson was then asked whether he expected to receive a reward for his testimony, and he responded, “[i]t would be nice if they did.”
¶ 29. Merritts was also asked during direct examination whether he had been promised anything in return for his testimony. Like Thompson, he stated that he had not. Since Patton, Thompson, and Merritts all testified that they had not received any benefit for their testimony against Franklin, we fail to see how Moore lends any support to Franklin.
¶ 30. Franklin also cites Sherrell v. State, 622 So.2d 1233, 1236 (Miss.1993) to support his argument that the trial judge should have given a cautionary jury instruction, even though he did not request one. We disagree. In Sherrell, the Mississippi Supreme Court acknowledged that “[t]he testimony of jail-house informants, or ‘snitches,’ is becoming an increasing problem in this state.... ” Id. (quoting McNeal, 551 So.2d at 158). The supreme *515 court also stated that “[i]nformants are offering evidence against their fellow inmates in exchange for reduced sentences.” Id. The court further stated that “[a]l-though the trial judge allowed the testimony of [the informant] into evidence, he made certain that a cautionary instruction was given to the jury.” Id. While the supreme court in Sherrell approvingly took note of the trial judge’s action in giving the cautionary instruction, the court did not say that trial courts are required to give, sua sponte, a cautionary instruction whenever the evidence contains the testimony of a “jailhouse snitch.” As already noted, none of the witnesses received any benefit in exchange for their testimonies. Thus, Sherrell, like Moore, does not help Franklin in any way.
¶ 31. A review of the testimony offered at trial clearly reflects that Franklin’s guilty verdict is not against the overwhelming weight of the evidence, despite his assertions to the contrary. There is no merit to this issue.

2. Ineffective Assistance of Counsel

¶ 32. In Read v. State, 430 So.2d 832, 841 (Miss.1983), the Mississippi Supreme Court set forth the procedure for the appellate court to follow when a defendant has raised the issue of ineffective assistance of counsel on direct appeal:
The [c]ourt should review the entire record on appeal. If ... [after] a review of the record, ... [the][c]ourt can say that the defendant has been denied the effective assistance of counsel, the [c]ourt should also adjudge and reverse and remand for a new trial.... Assuming the [c]ourt is unable to conclude from the record on appeal that defendant’s trial counsel was constitutionally ineffective, the [c]ourt should then proceed to decide the other issues in the case.... On the other hand, if the [c]ourt ... affirmfs], it should do so without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.
(Internal citations omitted). Alternatively, if the appellate court affirms it may still “reach the merits of the ineffectiveness issue where ... the record affirmatively shows ineffectiveness of constitutional dimensions, or ... if the parties [have] stipulate[d] that the record is adequate and the [c]ourt determines that findings of fact by a trial judge[,] able to consider the demeanor of witnesses, are not needed.” Id.
¶ 33. Franklin argues that his trial attorney was ineffective because he failed to seek a cautionary jury instruction advising the jury to weigh the testimonies of Patton, Thompson, and Merritts with great care and caution and to look upon their testimonies with distrust and suspicion. Franklin also argues that his trial attorney rendered ineffective assistance because he failed to timely subpoena witnesses that Franklin contends were essential to his defense. With respect to Franklin’s contention that his attorney failed to timely subpoena witnesses, the record reflects that after the State rested its case, Franklin’s attorney informed the court that five days prior to trial he had subpoenaed eighteen witnesses. He also indicated that none of the witnesses that he had subpoenaed who were in the custody of the Mississippi Department of Corrections were present at the trial. Additionally, Franklin’s attorney stated in pertinent part:
Your Honor is aware we tried this thing three times. This is the same kind of thing I filed in the last case, and we didn’t have any problem locating witnesses then. I am not saying anyone did anything deliberate. I wouldn’t say that, because I don’t actually believe any of this is deliberate, but I think some *516 where in the process there has been a little break down, and it has now caused some friction between myself and my client. We are at odds as to how to proceed here, what to do next. I have given him my opinion, that with the two witnesses, one in absentia, that we will be providing in certain stipulations and admissions of evidence between myself and the [S]tate, that we will have established what we need by way of evidence. But my client wants you to know that he objects to my theory of what we should do here, and I don’t know if it’s going to be a problem. I am comfortable myself in proceeding from [sic] now, but I know my client wants me to have this on the record.
¶ 34. Based on Franklin’s counsel’s statement, it would not be an impermissible inference to conclude that some of the ■witnesses who were subpoenaed but did not appear for trial testified in Franklin’s previous trials that resulted in mistrials. Hence, we cannot conclude that Franklin’s “counsel was constitutionally ineffective” because we are not informed as to what the testimonies of those witnesses might have been, and the parties have not stipulated that the record is adequate for us to make that determination. Therefore, in accordance "with Read, we decline to decide Franklin’s ineffective assistance of counsel claim. He may, if he desires to do so, file an appropriate motion for post-conviction relief raising the ineffective assistance of counsel issue.

3. Circumstantial Evidence Jury Instruction

¶ 35. The defense tendered jury instruction D-6, which reads as follows:
The Court instructs the jury that before you are warranted in convicting the Defendant on the evidence in this case you must exclude every reasonable hypothesis consistent with his innocence; and that if there is a reasonable hypothesis consistent with his innocence then it is your sworn duty to find the Defendant not guilty.
The State objected, arguing that a circumstantial evidence instruction was not warranted because direct evidence links Franklin to the murders. The defense disagreed and argued that the circumstantial evidence instruction should be given because there was no direct evidence that Franklin killed Brock and Mason. Initially, the trial judge concluded that instruction D-6 would be granted; however, the State continued to assert that a circumstantial evidence instruction was not warranted. The State argued that the testimonies of Patton and Sumrall qualify as direct evidence. Thereafter, the court agreed with the State and refused to grant the instruction.
¶ 36. “Circumstantial evidence instructions are required when the prosecution is without a confession and without eyewitnesses to the gravamen of the offense charged.” Simpson v. State, 553 So.2d 37, 39 (Miss.1989) (citing Woodward v. State, 533 So.2d 418, 431 (Miss.1988)).
¶ 37. We agree with the trial court that Franklin was not entitled to a circumstantial evidence instruction because the State presented the testimony of Patton and Merritts who testified that Franklin confessed to them that he had killed Mason and Brock. There is no merit to this issue.

Jh Confrontation Clause

¶ 38. In his final issue, Franklin contends that he was denied the right to confront a witness against him. Franklin argues that his attorney was attempting to impeach Johnson’s credibility by showing that she suffered from a mental condition and that she could not read. He contends *517 that his attorney was prevented from doing so by the State’s objection and by the trial court’s sustainment of the objection. On this point, the record reflects the following exchange between Franklin’s attorney and Johnson:
Q. You’re aware that they recorded the statements that you made?
A. Right, recorded.
Q. And they were eventually reduced to typewritten.
A. I guess so.
Q. You never read—
A. I never read the statement, never.
Q. All right. Ms. Johnson, I’m not trying to embarrass you or anything, but you said you were unemployed. Why is that?
A. I draw disability, mental.
Q. What do you draw disability for?
A. Mental.
[ATTORNEY FOR STATE]: Object to relevancy, judge.
THE COURT: Sustained.
[ATTORNEY FOR DEFENDANT]: One moment, please, your Honor. No further questions.
¶ 39. We find that Franklin’s contention here is not borne out by the record. As the above colloquy shows, Franklin was not prevented from achieving the objective that he contends was the aim of his cross-examination: showing that the witness had a mental condition and could not read and write. He was able to elicit from the witness that she was mentally disabled and that she never read the statement that she gave to the police. The colloquy demonstrates unquestionably that Franklin’s attorney did not attempt to ask the witness whether she could read; rather he was attempting to ask her if she had read her statement when he was interrupted by her response that she “never read the statement, never.” After getting that response, Franklin’s attorney moved to another subject matter. All of this occurred prior to the objection. Therefore, we find that this issue lacks merit.
¶ 40. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF COUNT ONE: MURDER, AND COUNT TWO: MURDER, AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ON EACH COUNT, AND CONVICTION OF COUNT THREE: ARSON, AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH ALL SENTENCES TO RUN CONCURRENTLY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. Due to her inability to read and write, the prosecutor was allowed to read a portion of her statement to her in order to refresh her recollection.

. Patton was incarcerated for distribution of narcotics, and Thompson was serving a fourteen-year sentence for drug trafficking.

. Thompson noted that he also had seen the smoke in the air before he ran into Franklin.

. Thompson stated that he did not know how Lieutenant Petersen knew to contact him.

.Merritts stated that the duplex where he lived is located in front of the apartment complex where Franklin lived.

. Franklin and Hawthorne were dating in 2001 when the murders occurred. However, Patton claimed that he was unaware of Franklin and Hawthorne's relationship.

. D-24 reads as follows:
The Courl instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged informant, and requires the jury to weigh [the] same with great care and suspicion. You should weigh the testimony from alleged informant, and passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.