## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00703-SCT

*SHARROD RAY MOORE*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/1998 |
| TRIAL JUDGE: | HON. ROBERT LEWIS GIBBS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES R. MULLINS |
| | MERRIDA COXWELL |
| | LULA M. ANDERSON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 6/21/2001 |
| MOTION FOR REHEARING FILED: | 01/03/2001 |
| MANDATE ISSUED: | 7/12/2001 |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The previous opinions are withdrawn, and this opinion is substituted therefor.

¶2. Sharrod Ray Moore was found guilty of two counts of capital murder under Miss. Code Ann. § 97-3-19(2)(e) (1994) and sentenced to serve two consecutive life sentences in the custody of the Mississippi Department of Corrections. Moore appealed to this Court, asserting the following assignments of error:

### ISSUES

**I. The trial court committed reversible error by refusing to grant an informant instruction which Moore requested.**

We find this issue to be dispositive; however, because Moore's remaining assignments involve issues that may arise on remand, we address each of them.

**II. The trial court committed reversible error by refusing to grant the circumstantial evidence instructions which Moore requested.**

**III. The trial court committed reversible error by failing to suppress the evidence seized**

**from Moore's car without a warrant.**

**IV. The trial court committed reversible error by allowing the State to use Fredrick Pediway's prior convictions for impeachment purposes.**

**V. The trial court committed reversible error by failing to grant Moore's motion for a judgment notwithstanding the verdict, or in the alternative, a new trial on the ground that a juror communicated with a police officer who was a witness at Moore's trial.**

**VI. The trial court committed reversible error by failing to grant Moore's motion for a judgment notwithstanding the verdict, or in the alternative, a new trial in that the verdicts were against the weight of the credible evidence.**

### FACTS

¶3. Samuel King and Mary Donelson, who owned and operated the Morocco Club ("Club") in Jackson, Mississippi, were shot and killed during a robbery of the Club. At the time the fatal shots were fired, Cedric Body was standing about 100 yards from the Club. Upon hearing the shots, Body turned and observed one young man standing outside the Club. Seconds later, a second young male who was doubled over exited the Club. The first man then left on foot and returned, driving a maroon car with a white top. At that point, the first man placed the second one into the car and drove away hurriedly. As the car left, Body noticed the trunk "flapping" up and down as if it were not shut. Like Body, Alma Chambers, who lived directly across the street from the Club, informed police officers responding to the shootings that she had observed a two-door, 70's model Chevrolet Malibu, maroon in color with a white top, leaving the Club shortly after the shots were fired.

¶4. Minutes later, a car fitting that description arrived at the University of Mississippi Medical Center ("UMC"). Sharrod Ray Moore was driving, and Marcus Walker, who was suffering from what was to become a fatal gunshot wound to the chest, was the sole passenger. Rather than driving to the emergency room ("ER") entrance, Moore dumped Walker onto the road and attempted to leave hospital grounds. Moore's car, however, stalled. Before Moore could leave, UMC officer Chris Peterman arrived and personally escorted Moore to the ER.

¶5. After detaining Moore, Peterman returned to Moore's vehicle where he noticed, hanging from the car's partially open trunk, a loose string which had apparently been used to tie down the trunk. Shining his flashlight into the trunk, Peterman saw bloody money. Peterman then shined the light in the passenger compartment and noticed the handle of a firearm protruding from under the driver's seat. Peterman testified that UMC officer John Gray, in his presence and pursuant to their supervisor's orders, removed, without first obtaining a warrant, the gun from the car, emptied it, placed it in a plastic bag, and put it on top of Moore's car.

¶6. Upon being alerted to these facts, the Jackson Police Department ("JPD") dispatched several officers to UMC. JPD officers further searched Moore's vehicle, seizing $285 in bloody U.S. currency and three firearms, one of which belonged to Samuel King and which had fatally wounded Marcus Walker. Subsequently, the officers informed Moore that he would be detained for questioning, and Moore became combative and had to be physically subdued by several officers. During questioning, Moore allegedly gave several different explanations for Walker's injury. First, Moore stated to JPD sergeant Ron Sampson that

someone had shot Walker as the two of them were riding in Moore's car. Next, Moore told both JPD officer Walter Walker and UMC officer Peterman that Walker had come to his house after being shot. Then, Moore informed UMC sergeant Clarence Hasberry that Walker had been shot while the two of them stood in someone's front yard at a party. Finally, Moore said to JPD detective Ronald Youngblood that Walker had borrowed his car and was wounded when he returned to Moore's house.

¶7. Meanwhile, back at the Club, JPD investigators, who had begun searching for physical evidence, discovered signs indicating a robbery had occurred. The cash register, which had been opened, contained no paper money and only a few coins. Nearby, a Trustmark National Bank money bag containing a substantial amount of money was found. Investigators also retrieved three twenty dollar bills outside the Club.

¶8. Investigators also recovered other physical evidence at the Club including blood samples, fired projectiles, projectile jackets, and four fingerprints. Although most of the projectiles and projectile jackets were in very poor condition, John Dial, a JPD firearms examiner, testified that at least one projectile had been fired from one of the firearms seized from Moore's car and that at least one projectile jacket matched those found in a second firearm seized from that vehicle. As for the fingerprints taken at the Club, Patricia Jackson, a JPD fingerprint expert, testified that only three were readable and that none of those matched Moore's prints. Jackson stated, however, that one can touch an object without leaving a fingerprint, adding that it would be "next to impossible" to recover every latent fingerprint at the crime scene.

¶9. In addition to the physical evidence presented at Moore's trial, Andre Bully, Moore's former cell mate at the Hinds County Detention Center, testified that Moore had confessed to the murders. According to Bully's testimony, Moore and Walker planned to rob the Club, but their plans went awry when King pulled a weapon on them. Bully stated that Moore admitted he shot King and Donelson and that he shot Walker because Walker had begun to panic. Bully further stated that Moore had inadvertently left the money bag inside the Club.

¶10. Bully, who faced aggravated assault charges, reported Moore's alleged confession approximately three months after Moore made the statements. The day after informing authorities of Moore's alleged confession, Bully, who had been denied bond initially, was released from jail on his own recognizance. Bully denied having been offered or having received anything in exchange for his testimony in Moore's case, and he further denied having gained the information he testified about from Moore's discovery papers which Moore kept in their cell.

¶11. The defense offered two witnesses to counter Bully's testimony regarding Moore's alleged confession. The first was Fredrick Pediway, also an inmate at the Hinds County Detention Center, who testified that Bully admitted to him that Moore had not actually confessed but rather that Bully had read Moore's discovery materials in their cell at a time when Moore was not present. Pediway also testified that Bully stated that he planned to lie about Moore confessing in order to expedite his release from jail. Pediway admitted that he had five previous felony convictions, that he had previously used several different social security numbers and names, and that he currently had charges pending against him in Mississippi. Second, the defense called Hinds County Detention Center inmate Jamon Mayberry, who testified that Bully had tried previously to obtain information from him and other inmates regarding their cases so that he could turn that information over to the authorities in exchange for his release from jail. Mayberry admitted that he was currently facing charges of murder, accessory to murder, and cocaine possession.

¶12. Ultimately, the jury found Moore guilty of having murdered King and Donelson, the owners of the Morocco Club, while engaged in the commission of robbery. The trial court then sentenced Moore to serve two consecutive life sentences in the custody of the Mississippi Department of Corrections. Moore now appeals to this Court.

## DISCUSSION

### I. Whether the trial court committed reversible error by refusing to grant an informant instruction which Moore requested.

¶13. Moore contends that, because Andre Bully was a jailhouse informant, the trial court should have instructed the jury to review more closely Bully's testimony by granting jury instruction D-24, which stated:

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged informant, and requires the jury to weigh same with great care and suspicion. You should weigh the testimony from alleged informant, and passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.

¶14. The State is correct in its assertion that in *Manning v. State*, 735 So.2d 323, 335 (Miss. 1999), and *Gray v. State*, 728 So.2d 36, 72 (Miss. 1998), this Court held that where informants do not receive favorable treatment in exchange for testifying, a trial court's refusal to grant an informant instruction is not necessarily error. Under the facts of the present case, this Court cannot confidently say that Bully received nothing in exchange for his testimony. Bully, who was facing aggravated assault charges, was released on his own recognizance after cooperating with the State in Moore's case. Bully's attorney testified that Bully probably would not have been released without providing a statement to the State. Six months after making his statement, Bully received an order of nolle prosequi based upon "insufficient evidence upon which to obtain a valid conviction." The fact remains, however, that Bully did receive the benefit of being released on his own recognizance the day after he signed a statement against Moore. We hold this to be sufficient evidence of favorable treatment in exchange for his testimony to support the granting of the requested cautionary instruction.

¶15. Regarding this sort of "jail-house snitch" testimony, we have stated that it is "becoming an increasing problem in this state, as well as throughout the American criminal justice system." *McNeal v. State*, 551 So.2d 151, 158 (Miss. 1989). In *Sherrell v. State*, 622 So.2d 1233, 1236 (Miss. 1993), we held that the trial court did not err in allowing the testimony of a "jail-house informant." We qualified this holding, though, stating:

> Although the trial judge allowed the testimony of [the informant] into evidence, he made certain that a cautionary instruction was given to the jury....The jury was instructed to view his testimony with caution and suspicion in light of [his] criminal conviction. The judge also reminded the jurors that they should consider the rest of the physical evidence presented during the trial and not judge the case based on the alleged confession...**No evidence was presented which showed that [the informant] would benefit in any way for testifying against Sherrell.**

*Id.* at 1236 (emphasis added). *Sherrell* indicates the importance of cautionary instructions when such "snitch" testimony is offered. In *Gray*, this Court reiterated that it does not view inmate testimony favorably.

*Gray*, 728 So.2d at 72. There, the Court upheld the admission of two jailhouse informants' testimony because "the evidence in the record before the Court does not establish the inmates received anything in exchange for their statements." *Id.* Ironically, the State argued that Gray could have submitted an instruction "requiring the jury to weigh an informant's testimony with caution and suspicion," the very same type of instruction proposed by Moore. *Id.* Likewise, in *Manning*, this Court affirmed the denial of a cautionary instruction based partly on the fact neither informant had received any "preferential treatment" in exchange for their testimony. *Manning*, 735 So.2d at 335.

¶16. The trial judge refused Moore's requested instruction based on his view that instruction C-2 would "cover any witness." Instruction C-2 stated:

> Each person testifying under oath is a witness. You have the duty to determine the believability of a witness. In performing this duty, you must consider each witness's intelligence, the witness's ability to observe and accurately remember, the witness's sincerity, and the witness's demeanor while testifying. You must consider also the extent the witness is either supported or contradicted by other evidence; the relationship the witness may have with either side; and how the witness might be affected by the verdict.

> In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate falsehood, and whether it pertains to a matter of importance or an unimportant detail.

> You may reject or accept all or any part of a witness's testimony and you may reject part and accept other parts of a witness's testimony.

> After making your own judgment, you will give the testimony of each witness the credibility, if any, as you may think it deserves.

Jury instruction C-2 did not advise the jury to weigh Bully's testimony with "caution and suspicion." In view of our position on the unreliability of jailhouse informant or "snitch" testimony, we do not agree that instruction C-2 adequately instructed the jury on the weight to be given to Bully's testimony. For the foregoing reasons, this Court finds that the trial court erred in refusing jury instruction D-24 and that it was an abuse of discretion to deny Moore a cautionary instruction in the face of evidence that Bully may have received favorable treatment in exchange for his testimony.

### II. Whether the trial court committed reversible error by refusing to grant the circumstantial evidence instructions which Moore requested.

¶17. Moore alleges that the trial court erred in refusing to give four requested jury instructions on circumstantial evidence, asserting that the only direct evidence of his guilt consisted of his alleged jailhouse confession to Andre Bully. This Court finds no error by the trial court in refusing these instructions.

¶18. This Court has held that a confession constitutes direct evidence and that the existence of a confession precludes the need to provide circumstantial evidence instructions, stating that:

> A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant. *Clark v. State*, 503 So. 2d 277, 279 (Miss.1987). The "confession" which constitutes direct evidence of a crime is not limited to a

confession to a law enforcement officer but also includes an admission made to a person other than a law enforcement officer. *Mack v. State*, 481 So. 2d 793, 795 (Miss.1985). In *Holliday v. State*, 455 So. 2d 750, 752-53 (Miss.1984), a witness testified that he had overheard the defendant say to another person that he had killed his wife. This Court held that the circumstantial evidence instruction was not required. *See Foster v. State*, 508 So. 2d 1111, 1115 (Miss.1987) (Court held that without "jailhouse confession" the case would have been entirely circumstantial).

*Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991). As Moore points out, prior to *Ladner*, this Court expressed doubt as to whether a jailhouse informant's testimony "should be considered as direct evidence which would prevent the granting of a circumstantial evidence instruction." *McNeal*, 551 So. 2d at 159. While *McNeal* declined to answer that question, *Ladner* settled the matter, holding that when the type of testimony given by Bully in the case sub judice is present, circumstantial evidence instructions are not necessary. Thus, Moore's second assignment of error is without merit.

### III. Whether the trial court committed reversible error by failing to suppress the evidence seized from Moore's car without a warrant.

¶19. Moore claims the trial court erred in not suppressing evidence seized from his car without a warrant. This Court finds no error by the trial court as the evidence here was properly seized under an exception to the warrant clauses of the Fourth Amendment of the United States Constitution and Article 3, Section 23 of the Mississippi Constitution.

¶20. While the government generally is required to obtain a warrant prior to executing a search and seizing items therein, this Court has carved out an "automobile exception" that allows officers to search a vehicle without a warrant when there is probable cause to believe "that the vehicle itself may be evidence of crime or contain something that offends against the law." *Graves v. State*, 708 So. 2d 858, 862 (Miss. 1997). This Court has further held that the "automobile exception" applies even where the vehicle has been immobilized or is unmovable. *Franklin v. State*, 587 So. 2d 905, 907 (Miss. 1991). The existence of probable cause should be determined based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527, 548 (1983); *see also Lee v. State*, 435 So. 2d 674, 675 (Miss. 1983) (adopting "totality of circumstances" approach of *Gates*). The admissibility of such evidence rests within the discretion of the trial court, and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused has occurred. *Sturdivant v. State*, 745 So. 2d 240, 243 (Miss. 1999).

¶21. In the instant case, Moore arrived at UMC with Marcus Walker, who had been shot. Moore removed Walker from his car and attempted to leave. Moore's car, however, had stalled. UMC officer Chris Peterman subsequently detained Moore, who stated that he needed to leave. Peterman prevented Moore from departing and transported Moore to the ER. Peterman then returned to Moore's vehicle where he noticed that the trunk was partially open. In the trunk, Peterman saw bloody money. Peterman then looked into the passenger compartment and observed the handle of a firearm protruding from under the driver's seat. Peterman and fellow UMC officer John Gray, then removed, without first obtaining a warrant, the gun from the car.

¶22. Several JPD officers, including Sergeant Ron Sampson, Detective John Williams, and Detective Ronald Youngblood, arrived at UMC shortly thereafter and confirmed that the trunk was open. The officers testified to seeing bloody money in the trunk, as well as blood and guns inside the passenger compartment.

Detective Williams also noted that a witness at the scene had advised him that the trunk of the car was open and bouncing up and down as it left the Club.

¶23. Despite conflicting testimony from JPD officer Henry Jackson, who testified that Peterman stated Moore's trunk was initially closed, but not locked, and that Peterman opened the trunk and then observed the bloody money, the trial court found that the trunk was open and that the items contained therein were in plain view. The trial court added that based on the blood visible inside the passenger compartment and the bloody money in the trunk, the "incriminating characteristic of the weapon was immediately apparent" and therefore was lawfully seized by officer Gray.

¶24. This Court agrees with the trial court. UMC officers Peterman and Gray knew that the car had been used to bring a gunshot wound victim to the hospital and that, rather than taking Walker to the ER, Moore had put him out in the street and had attempted to leave hospital grounds. Additionally, Peterman and Gray observed blood-covered money in plain view in the trunk of the car and blood throughout the passenger compartment. The fact that Moore's car had become temporarily inoperable, does not, under this Court's previous holdings, provide Moore any relief. Based on the totality of the circumstances, the presence of the gun under the seat, coupled with the aforementioned circumstances, created probable cause for the officers to believe that evidence of a crime might be contained in the car, thus placing the search and seizure of said gun within the "automobile exception" to the warrant requirement. This Court finds no abuse of discretion by the trial court in allowing the State to admit the evidence seized from Moore's car, and this assignment of error fails.

### IV. Whether the trial court committed reversible error by allowing the State to use Fredrick Pediway's prior convictions for impeachment purposes.

¶25. Moore contends that the trial court erred in failing to conduct an on-the-record balancing test as set forth in *Peterson v. State*, 518 So. 2d 632, 636 (Miss. 1987), before allowing in evidence of defense witness Fredrick Pediway's prior convictions. While this Court acknowledges that the trial court did not conduct a *Peterson* balancing test, this Court finds no error as any prejudice Pediway may have suffered is irrelevant.

¶26. Rule 609 of the Mississippi Rules of Evidence, which governs the admission of evidence of prior convictions, provides that:

> **(a) General Rule.** For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.

> **(b) Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction.

Prior to admitting such evidence, the trial court must make an on-the-record determination that the probative value of evidence of a prior conviction sought to be used for impeachment outweighs the

prejudicial effect of that evidence. *Peterson*, 518 So. 2d at 636. However, if the witness to be impeached through the admission of prior convictions is not a party, any prejudice to that non-party witness is irrelevant as a non-party can suffer no prejudice. *Young v. State*, 731 So. 2d 1145, 1151 (Miss. 1999). In *Young*, this Court emphasized that, where a party is being impeached through the use of prior convictions, a *Peterson*-type balancing test "is necessary to prevent a defendant from being convicted on the basis of a prior bad act rather than on the evidence presented at trial regarding the present crime." *Young*, 731 So. 2d at 1150. However, when the witness being impeached is not a party, that potential problem does not exist; and therefore, even where the non-party witness being impeached is one party's primary or sole witness, evidence of a prior conviction of that witness must be admitted if the requirements of Rule 609(a) and (b) are met. *Id.* at 1150-51.

¶27. In the case sub judice, when Moore called Pediway as a witness in an attempt to discredit Andre Bully's testimony regarding Moore's alleged confession, the State advised the trial court that it planned to use Pediway's five previous felony convictions[1] for impeachment purposes. Moore then asked the trial court to perform a *Peterson* balancing test to which the trial court responded by stating:

> Under [Rule] 403 [of the Mississippi Rules of Evidence], my job is to consider the probative effect of the inquiry versus any prejudicial effect that it may have. In reviewing the crimes which are listed on the Abstract of Judgment, this witness have [sic] been convicted of attempted murder, robbery, assault with a firearm twice, and then assault with a firearm on a peace officer. Those, in my opinion, are clearly probative and they obviously are prejudicial. So when I weigh the two, I'm going to find that the probative value outweighs any prejudice and allow the inquiry; particularly, in light of the ten-year time limit that the rules committee have [sic] allowed me to consider. While I recognize that they are old, it is within the ten-year time period.

¶28. While the trial court did not conduct the type of full on-the-record determination contemplated by this Court in *Peterson*, the trial court did not commit reversible error because any prejudice Pediway suffered in being impeached is irrelevant. Pediway's prior convictions met the requirements of Rule 609(a) and (b), and thus, it was proper for the trial court to allow those convictions to be admitted. This Court finds no error in the trial court's decision to allow Pediway's prior convictions to be used for impeachment purposes.

**V. Whether the trial court committed reversible error by failing to grant Moore's motion for a judgment notwithstanding the verdict, or in the alternative, a new trial on the ground that a juror communicated with a police officer who was a witness at Moore's trial.**

¶29. Moore claims the trial court erred in failing to grant a J.N.O.V., or in the alternative, a new trial due to alleged communications between a juror and a witness for the State at Moore's trial. This Court, however, finds no abuse of discretion by the trial court in denying Moore's motions.

¶30. Rule 3.06 of the Uniform Circuit and County Court Rules clearly prohibits contact between jurors and witnesses and requires the trial court to instruct jurors on this point. When reviewing allegations of improper contact between a juror and a witness, this Court has afforded great deference to the trial court's determination, stating:

> A trial judge is in a better position to assess the effect of incidents which may require a mistrial than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial.

*Cavett v. State*, 717 So. 2d 722, 729 (Miss. 1998). This Court also "presume[s] that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Puckett v. State*, 737 So. 2d 322, 347 (Miss. 1999). If the trial court determines contact occurred between a juror and a witness but finds such contact harmless, this Court will not reverse unless that determination was clearly erroneous. *Esparaza v. State*, 595 So. 2d 418, 425 (Miss. 1992).

¶31. In the case sub judice, Moore called Marietta D. Harris, who testified at a hearing on Moore's J.N.O.V. motion that she observed, on two occasions, a juror speaking with one of the officers who had testified at trial. Harris could not testify as to the substance of the conversations but noted that the juror and officer were "laughing and talking." Harris did not know the name of either the juror or the officer and could only provide general physical descriptions of the two individuals. Finally, Harris did not come forward with this testimony until Moore had been sentenced. The trial court subsequently denied Moore's motions for a J.N.O.V. and new trial, finding Moore's contention to be without merit.

¶32. Finding no abuse of discretion by the trial court, this Court upholds that determination for two reasons. First, Moore's witness offered only vague, unsubstantiated, after-the-fact testimony. Moore presented no additional proof to support the testimony of Harris. Second, this Court presumes the jurors adhered to the trial court's repeated instructions to refrain from communicating with "the attorneys or anyone else connected to the case." The trial court so instructed the jury before the opening statements and reiterated that instruction on day two of the trial when a question arose concerning contact between a juror and members of Moore's family. For both reasons, this Court finds this argument without merit.

> **VI. Whether the trial court committed reversible error by failing to grant Moore's motion for a judgment notwithstanding the verdict, or in the alternative, a new trial in that the verdicts were against the weight of the credible evidence.**

¶33. Finally, Moore contends that the evidence failed to support his convictions for capital murder. In view of the fact that we are reversing and remanding for a new trial, we will not address this issue.

## CONCLUSION

¶34. Because the trial court erred in refusing Moore's proposed instruction on the weight to be given to the testimony of an informant, the judgment of the Circuit Court of the First Judicial District of Hinds County is reversed, and this case is remanded to that court for a new trial consistent with this opinion.

¶35. **REVERSED AND REMANDED.**

> **BANKS AND McRAE, P.JJ., MILLS, WALLER AND DIAZ, JJ., CONCUR. SMITH, COBB AND EASLEY, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**

1. These convictions were nine years old as of the time of trial, and each of them was punishable by imprisonment of more than one year under the laws of the state of California.