**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 1999-KA-01754-SCT**

*LINDA LEEDOM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/1999 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM D. MASSEY |
| | LORNA S. McCLUSKY |
| | STEVEN W. PITTMAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | ROBERT L. WILLIAMS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/27/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/18/2001 |

**BEFORE BANKS, P.J., MILLS AND DIAZ, JJ.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The original opinion is withdrawn, and this opinion is substituted therefor.

¶2. Linda Leedom appeals her convictions for conspiracy to commit murder and the capital murder of Lula Young. Because we find the errors assigned by Leedom are not reversible, we affirm the convictions.

**I.**

¶3. Lula Young was asleep in her house on December 19, 1994, between 5:50 and 6:00 a.m., when a neighbor heard two explosive sounds coming from her house, and shortly thereafter saw the house enveloped in flames. Young died in the fire. Firefighters called to the scene found a propane tank and several oxygen bottles. Upon closer inspection, it appeared the tank's release valve was vented out and opened one fourth of the way. Investigators initially attributed the cause and intensity of the fire to the combination of propane and oxygen in the house. At trial, an expert testified that the fire was intentionally started and caused by propane leaking from the tank.

**a. Conspiracy to the Commit Capital Murder of Lula Young**

¶4. Linda Leedom met Charles Wayne Dunn shortly after moving in with her daughter and son-in-law in December of 1993. At trial, Dunn testified Leedom approached him with the idea to kill Young, explaining that Young was her best friend and was dying of cancer. Leedom said Young asked her to kill her, but she

did not have the heart to do it so she offered Dunn $5,000 to do it for her. He agreed. To kill Young, Dunn said he suggested they use an electrical heater to start a fire and purchased the heater with funds given to him by Leedom. He could not recall, however, who purchased the propane tank. Another witness, however, testified that on the day of the incident, Leedom said she purchased a grill for her daughter and son-in-law for Christmas and stored the propane tank in Young's home.

¶5. On the night before the fire, Dunn parked his car in Young's driveway and entered the house. He retrieved the heater from his truck, crushed some newspaper nearby, opened the valve on the propane tank, turned on the heater, and left the house. He testified the next day he went to Leedom's home and collected $1,000 from her with the balance to be paid in smaller amounts over time. A confidential informant later told the police that Dunn had been talking about the fire. The police picked him up for questioning, and he confessed to the murder and to conspiring with Leedom.

¶6. In a search of Leedom's home in March of 1997, two life insurance policies on Young's life in the amounts of $75,000 and $500,000, designating Leedom as the primary beneficiary, were discovered along with a third policy designating Leedom's husband as the beneficiary in the amount of $200,000. A partnership agreement was also discovered between Leedom and Young with a power of attorney granted to Leedom from Young.

¶7. At trial, insurance agents testified Leedom made inquiries in 1992 about making a claim on her "sister's" insurance, whom she said was Lula Young. Leedom listed herself as the owner of the $75,000 policy and her address as Young's address. One insurance agent, Greg Paylor, testified that he even saw a family tree displayed openly at Leedom's home depicting Young as her sister. Another agent testified that Leedom made a request for an additional $200,000 policy and when he went to Leedom's home to issue the policy, Leedom introduced herself as Lula Young. On this policy, Gary Leedom, the defendant's husband, was listed as Young's brother-in-law and Linda Leedom as her sister.

¶8. A third agent, Brenda Driver, with Nationwide Insurance was contacted by Leedom to write an insurance policy and a buy/sell agreement for she and her "sister" and "business partner", Lula Young. When Agent Driver arrived at the Leedom's home, Leedom introduced herself as Lula Young, and this time named "Linda Leedom" as the beneficiary and the sister of the proposed insured, Young. Driver then wrote a policy for $500,000 for Young along with a $200,000 accidental death rider. Leedom signed the application as Lula Young. Later, Agent Driver heard that Young was killed in a fire and attempted to call Young. Leedom answered the phone and announced that her sister had died. Driver later saw the person she knew as Lula Young, however, at a local Wal-Mart. She immediately informed her superiors and the authorities.

### b. The Stovall Plan

¶9. In a search of Leedom's home during the investigation, life insurance policies were also found on Robert Stovall, who is unrelated to Leedom by blood or marriage and was unaware of the insurance polices on his life. The following items were seized in the search:

1. An insurance policy from Kansas City Life Insurance Company, dated November 13, 1995, on the life of Robert Stovall in the amount of $250,000 with Leedom named as the secondary beneficiary.

2. An insurance policy on the life of Robert Stovall in the amount of $200,000 with Leedom as the

primary beneficiary and her husband, as the secondary beneficiary.

3. An application for life insurance on the life of Stovall in the amount of $200,000 along with an accidental death rider. Melanie Wright's signature, the defendant's daughter, appears as owner and beneficiary.

4. An identification card with a picture of Charles Wayne Dunn appearing over the printed name of Stovall along with the defendant's address.

5. Two wills purporting to be those of Lula Young. One dated, October 7, 1994, the other not dated.

6. An insurance identity card in the name of Stovall.

7. An invoice reflecting the sale of a 1995 Nissan to Melanie Wright and Stovall, and an installment sales contract, bearing the date of August 4, 1995 with these names appearing as purchasers.

8. An application for credit life insurance and disability insurance for Melanie Wright and Stovall dated August 4, 1995.

9. Three typewriters.

10. Three checkbooks from total control accounts from Metropolitan Life Insurance Company indicating Leedom as owner of two policies and her husband, the other.

¶10. An insurance agent, who had taken out a policy on Young for Leedom, testified that she had inquired about a policy she wished to take out on Robert Stovall and made an application for a $200,000 policy. The application listed Melanie Wright, Leedom's daughter, as beneficiary and the sister of Stovall. The application was never processed, however, because the company required that agents meet the proposed insured, and no such meeting was ever arranged for Stovall.

¶11. Another agent, Thomas Cooper, for Kansas City Life Insurance, testified that he also met with Leedom to issue a policy on Robert Stovall, who was listed this time on the application as Leedom's son-in-law. The face value of this policy was $250,000 with an additional $200,000 accidental death rider. Leedom was listed as the contingent beneficiary and her address as Stovall's address. Agent Cooper also testified that he was introduced to a person said to be Robert Stovall, but could not identify the real Stovall in court as the person he met.

¶12. When asked at trial about Stovall, Dunn testified that after Young's death Leedom approached him with a request that he kill Stovall. She did not give a reason for wanting him killed, he said, but offered him $10,000 to commit the murder, and he agreed. He then obtained a fraudulent identification card with Stovall's name and his (Dunn's) photograph. With money given to him by the defendant, he purchased a 1979 Toyota Celica to be used in a car wreck with Stovall and testified that the defendant took him to Stovall's hometown to commit the murder.

¶13. In March of 1997, Leedom was indicted in federal and state courts on multiple counts. The State elected to try Leedom for the conspiracy to commit capital murder and the capital murder of Young and prior to trial, moved to amend the indictment to charge Leedom as a habitual offender. The jury found the defendant guilty of conspiracy and murder and sentenced her to life without parole and twenty (20) years

respectively. Aggrieved, Leedom appeals the convictions, assigning several errors.

## II.

¶14. Leedom's primary argument on appeal charges the lower court with error in admitting evidence that she engaged in a second conspiracy to kill Robert Stovall for insurance money. Prior to trial, she filed a motion in limine to preclude the prosecution from offering evidence regarding Stovall. It was denied, and over her objection Dunn testified that he and Leedom conspired to kill Stovall. All evidence of the Stovall Plan is inadmissible, Leedom contends, under Miss. R. Evid. 404(b), which contemplates prior not subsequent acts, like those here.

¶15. Leedom is mistaken. The general rule in criminal trials, with certain exceptions, is that proof of other criminal conduct by the accused is inadmissible. *Tobias v. State*, 472 So.2d 398, 400 (Miss. 1985); *Donald v. State*, 472 So.2d 370, 372 (Miss. 1985); *Mason v. State*, 429 So.2d 569, 572 (Miss. 1983). The sequence in which offenses are committed is immaterial in determining whether in a prosecution for one offense proof of the other offense is admissible, since "it is their integration into the incident, interwoven with similar provocation and purpose which makes it impractical to draw a curtain at the end of any particular act behind which the jury may not peer." *Walker v. State*, 201 Miss. 780, 782, 30 So. 2d 239 (1947). Evidence of other bad acts is thus admissible regardless of whether they occur before or after the charged offense. Whether such proof is admissible depends, rather, upon whether it is introduced for one of the express purposes set out in Rule 404(b) of the Rules of Evidence, which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, preparation, plan, knowledge, identity, or mistake or accident.

As there exists an inherent danger of prejudicial effect in the use of other acts evidence, the 404(b) exception for which the crime is introduced must be a material issue in the case. Moreover, its probative value must not be substantially outweighed by the prejudicial effect, Miss. R. Evid. 403.

¶16. Leedom argues the Stovall Plan cannot demonstrate anything meaningful regarding motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. We disagree. In *Ford v. State*, 546 So. 2d 686 (Miss. 1989), defendants on trial for bank larceny objected to the State introducing evidence that they committed a second bank larceny the next day. We concluded that evidence that the defendants went into a second bank reenacting essentially the same manner of theft as had occurred the day before, showed they had acted according to a predetermined plan in the larceny charged more probable than without such evidence. The same is true here. The fact that there is other crime evidence showing that Leedom had essentially the same plan and preparation to kill Stovall, has a tendency to make the fact that she and Dunn were acting according to a predetermined plan or agreement to kill Young more probable than it would be without such evidence, particularly in light of her defense-- that Dunn was solely responsible for the fire that killed Young.

¶17. She has said that Dunn knew of the insurance policies on Young's life and that the defendant was the beneficiary. His plan, according to Leedom, was to kill her and her husband, so that he and her daughter, Dunn's lover, would inherit the money. She only posed as Young, she explains, because Young had cancer and would never have been able to get insurance herself. In fact, she claims Young knew of the insurance

policies on her life and instructed her that proceeds would go towards the care of her children and Leedom. Though she may be guilty of mail and insurance fraud, therefore, Leedom insists she is innocent of conspiring to kill Young. It was Dunn alone.

¶18. We are not persuaded by this argument. The same insurance agents who testified that Leedom took out policies on Young, testified *she* took out two insurance policies on Robert Stovall, in the amount of $250,000, with Leedom named as the secondary beneficiary, and $200,000, with Leedom as the primary beneficiary. They also testified that Leedom said Stovall was her adopted brother who was always getting in accidents and fights. She told them she did not want him to be a burden on her parents so she needed insurance. She told other agents that Stovall was her future son-in-law and, as she did with Young, listed her address as Stovall's place of residence. Moreover, in her home, an identification card of Dunn was found with Stovall's name but with the defendant's address. Thus, the Stovall evidence clearly demonstrates that Leedom may have acted according to a pre-determined plan to kill Young and is admissible under Miss. R. Evid. 404(b). As the lower court also determined that the probative value of the Stovall evidence is not substantially outweighed by unfair prejudice under Miss. R. Evid. 403, we do not see reason to reverse.

¶19. Though Leedom submits that, unlike the larcenies in *Ford*, the Stovall plan occurred well over a year after Young's death, and therefore is too remote in time, we do not find the record demonstrates this to be the case.[1] The record reflects that 1995, the year following Young's death, is when the insurance polices were filed and the investigation of Leedom began. This does not dictate, however, the conclusion that the Stovall plan began in 1995. No exact dates were submitted regarding when Leedom may have begun the Stovall plan.[2] Furthermore, although the evidence in *Ford* occurred the very next day, the crimes committed by Leedom cannot be accomplished in a matter of seconds like bank larceny. The complex nature of conspiracies, rather, assures that they will be more slowly developed. We therefore hold that the evidence of a conspiracy to kill Stovall for insurance proceeds is not inadmissible other crimes evidence.

### III.

¶20. In addition to weighing its probative value, prejudicial evidence must be accompanied by a limiting instruction. The trial court instructed the jury on the Stovall evidence as follows:

> The Court instructs the Jury that there has been evidence and testimony concerning an alleged Conspiracy to Murder Robert Stovall for Fraudulent Insurance purposes. This evidence was offered in an attempt to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, regarding this Defendant, LINDA LEEDOM.

> You may give this testimony such weight and credibility as you deem proper under the circumstances. However, you cannot and must not consider this testimony in any way regarding whether or not this Defendant is guilty or not guilty of the crimes set forth in Count 1 and Count 2 for which she is presently in Trial.

Leedom's principal complaint is not with the instruction itself, but with the fact that it was given at the close of trial. She argues in order to have the intended curative effect, the instruction should have been given at the time the evidence is introduced, and with periodic reminders.

¶21. We have not spoken on this issue. Other jurisdictions are split. Some jurisdictions have held that

limiting instructions should be given at the introduction of the evidence and repeated in the court's general charge, *State v. McIntosh,* 534 S.E.2d 757 (W. Va. 2000); *State v. Williams,* 480 S.E.2d 162 (W. Va. 1996), while others require the defendant to make the request. *State v. Guidroz,* 721 So. 2d 480 (La. Ct. App. 1998); *State v. Pardon,* 703 So. 2d 50 (La. Ct. App. 1997). One court has held a special request must be made, *State v. Bolte,* 530 N.W.2d 191 (Minn. 1995). *See also United States v. Hernandez-Guevara,* 162 F.3d 863 (5th Cir. 1998) (limiting instruction does not have to be given for "other crimes" evidence each time the evidence is introduced when it is not requested and the instruction is given in the final charge); *United States v. Misle Bus & Equip. Co.,* 967 F. 2d 1227 (8th Cir. 1992) (although preferable, court's choosing to give limiting instructions only at close of the evidence complied with evidence rule and did not constitute error).

¶22. This trial was brief, lasting only six days. We conclude that, while it is preferable that limiting instructions be given at the introduction of prejudicial evidence and then again in the final charge, without such a request by Leedom here, the trial court was not in error.

## IV.

¶23. Leedom was indicted on December 1996 in federal court and in state court in March, 1997. In February, 1998, she pled guilty in federal court to two counts of mail fraud and one count of wire fraud and was thereafter sentenced to serve concurrent terms of twenty-seven months on each count. Following her convictions in federal court, the State amended its indictment to charge Leedom as a habitual offender pursuant to the provisions of Miss. Code Ann. § 99-19-81 (2000). Our habitual offender statute provides:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges *separately brought and arising out of separate incidents at different times* and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

*Id*. (emphasis added).

¶24. We must decide, therefore, whether the federal charges against Leedom arise out of separate incidents occurring at different times and were separately brought. Leedom submits that the two charges for mail and wire fraud are related, comprising parts of a common scheme or plan to commit insurance fraud, and as such, cannot constitute two "separate incidents at different times." We disagree.

¶25. Count One of the federal indictment alleged that, on or about May 21, 1992, Leedom committed the crime of mail fraud, referring to her use of the mail to send an application for insurance to Met-Life Insurance Company for Lula Young. Count Five of that indictment alleged that, on or about January 25, 1995, Leedom again committed mail fraud, referring to her use of the mail to send a claim on Young's life to Met-Life Insurance. Count Nine of that indictment alleged that, on or about January 30, 1995, Leedom committed mail fraud, referring to her use of the mail to send a claim to J.M.I.C. insurance, also on Young's life. Even assuming, arguendo, that the two counts relating to Met-Life insurance were "a single incident," count nine involving an entirely different insurance company is a separate incident and attempt by Leedom to commit insurance fraud. Accordingly, we find no error.

## V.

¶26. In her fourth assignment of error, Leedom argues the trial court committed reversible error in "sanction[ing] prosecutorial misconduct during closing argument by permitting the district attorney to testify about facts not in evidence." The following occurred during the State's rebuttal argument:

> *Well, folks, I can tell you as your District Attorney when I found out that Brenda --*
>
> BY MR. FRANKS [defense counsel]: Objection. It's not proper for him to comment on anything that happened with regard to any investigation unless it's in front of the jury. I don't know what he's going to say, but I know it's not proper. We've been down this road before, Mr. Williams and I.
>
> MR. WILLIAMS [District Attorney]: He said there was no suspicion by the authorities that there was foul play. I'm fixing to rebut that.
>
> MR. FRANKS: If they had it, they should have [presented it to the jury. I ain't seen it.
>
> MR. WILLIAMS: I'm fixing to rebut that, Judge. I've got every right to.
>
> THE COURT: Let met settle the dispute.
>
> The rule for closing argument is matters in evidence and logical inferences that may be drawn from matters in evidence.
>
> Now, this is a direct response, as I see it, to something that was said in closing argument. It can be expanded on but within the framework of matters into evidence and logical inferences.
>
> MR. WILLIAMS [to the jury]: Ask yourself when the insurance agent that wrote the half a million dollar policy on Lula Young sees Lula Young in Wal Mart the day after Christmas, seven days after she's burned up in that fire, would you suspect foul play?
>
> And no suspicion in this case, no foul play?
>
> It reeks of foul play.

¶27. Leedom takes issue with the statement: "*Well, folks, I can tell you as your District Attorney when I found out that Brenda -'',* contending that it constitutes an improper introduction of evidence that was not presented during trial. This is reversible error, she argues, because statements of fact that are not in evidence or that cannot be necessarily inferred from the evidence presented are prejudicial to the defendant. *Tubb v. State,* 217 Miss. 741, 64 So. 2d 911 (1953) The impropriety is further compounded, according to Leedom, by the prosecutor's urging the jury, during closing argument, to give the defendant "a good old dose of DeSoto County justice."

¶28. We do not find the first statement introduced matters not in evidence. If, as it appears, the prosecutor had in mind to tell the jury what he suspected, he did not pursue that course of argument. Moreover, the trial court, in effect, sustained Leedom's objection and directed the prosecutor to confine his argument to matters in evidence and he complied. The "DeSoto County Justice" comment, however, was improper, but we find does not rise to the level of reversible error in the circumstances of this case.

## VI.

¶29. Leedom also objected to the testimony of State witness, Sammy Webb, the chief of police. Webb was asked whether Stovall knew about alleged insurance policies taken out on his life. At trial, the following exchange occurred:

Q: Who is Robert Stovall?

A. Robert Stovall is a person who lives in Selmer, Tennessee, and Linda's mother and father was, and I believe is his guardian.

Q. Did the investigation, Mr. Webb, reveal whether or not this Stovall fellow even knew about all this insurance?

Mr. Massey [defense attorney]: If your Honor please, I respectfully object. That would be hearsay.

The Court: I believe that's an appropriate question for the witness.

A. He did not.

¶30. We agree with Leedom that this is inadmissible hearsay under M.R.E. 801 as it was offered for the truth of the matter asserted, that Stovall did not know of the insurance policies on his life. The record reflects the prosecution did not pursue the line of questioning, however, and when considering the significance of the hearsay testimony in conjunction with the State's evidence, we conclude beyond a reasonable doubt that the error did not infect the jury's verdict. *See Melton v. State,* 723 So. 2d 1156, 1160 (Miss. 1998); *Nicholson ex rel. Gollott v. State*, 672 So.2d 744, 754 (Miss. 1996) (harmless because testimony was cumulative); *Cabello v. State*, 471 So.2d 332, 339 (Miss. 1985) (considering the significance of the hearsay testimony in conjunction with State's extensive evidence, hearsay, but harmless).

## VII.

¶31. Next, Leedom argues the trial court erroneously admitted receipts, handwritten by her, indicating that each of Young's children would receive money from Leedom in the settlement of their mother's estate. She argues that no foundation was laid as to their authenticity and that they were inadmissible hearsay. Leedom did not object to authenticity at trial and thus may not do so here, however.

¶32. That said, the record indicates that a friend of the defendant testified that she recognized the defendant's handwriting. It is well established that a person's handwriting may be authenticated by a witness familiar with the writing, *Sewell v. State*, 721 So.2d 129, 139 (Miss. 1998). Because the receipts were identified as having been written by her, the State submits they were not hearsay but admissions of a party-opponent under Miss. R. Evid. 801 (d)(2)(a) which provides:

The statement is offered against a party and is (A) *his own statement, in either his individual or a representative capacity* or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

¶33. We have before held that incriminating letters written by a defendant are admissions of a party-opponent and, thus, non-hearsay evidence. **Burns v. State,** 729 So.2d 203, 219-20 (Miss. 1998) (upon determining the defendant wrote letters confessing to the crime, they are admissions). The receipts here acknowledge that Young's children would receive one-third of their mother's estate which, according to the receipt, would be $227.53. They further release Linda Leedom from all responsibilities and liabilities concerning their mother's estate as well as all monies and proceeds received, and are signed by each child without recourse. The record indicates the receipts were introduced by the State to challenge Leedom's contention that she had been instructed by Young to use the money to take care of her children. Certainly, $227.53 is not "taking good care" when hundreds of thousands of dollars are at issue. The receipts therefore are incriminating admissions of Leedom that are admissible under Rule 801(d)(2).

## VIII.

¶34. We address finally Leedom's assignments of error regarding the trial court's denial of several defense instructions. She first argues the jury should have been instructed on circumstantial evidence because there was minimal direct evidence presented at trial. Circumstantial jury instructions should be given only when the prosecution is without a confession or eyewitness to the gravamen of the offense charged, however. **Moore v. State,** 787 So. 2d 1282, 1288 (Miss. 2001). *See also* **Keys v. State**, 478 So. 2d 267 (Miss. 1985) (the defendant is not entitled to a circumstantial evidence instruction unless the State's case is wholly circumstantial in nature). The existence of any direct evidence eliminates the need for a circumstantial evidence instruction. **Sullivan v. State**, 749 So. 2d 983, 992 (Miss. 1999).

¶35. Leedom argues in support of the circumstantial evidence instruction that Dunn's testimony is uncorroborated. She would have the Court ignore, however, that two life insurance policies were found in her home listing her as a primary and secondary beneficiary; that she wrote letters and receipts for insurance money in settlement of Young's estate to Young's children; that insurance agents testified that she took out life insurance policies on Young, whom she represented was her sister; that though she says she is guilty of mail and insurance fraud only, a witness testified that she said she stored a grill with a propane tank in Young's home; that Dunn testified that Leedom gave him money to purchase an electric heater; and after opening the release valve on the tank he went to the defendant's home to collect the first installment of payment. With the direct evidence before the court, we find it did not err in denying the circumstantial evidence instructions.

¶36. Leedom argues the jury should have been instructed on conspiracy to commit manslaughter and manslaughter instructions (D-5--D-9) because the indictment insufficiently identified the type of felony she was charged with. She argues the indictment failed to specifically assert felony arson so she should have been charged with misdemeanor arson under Miss. Code Ann. § 97-17-13 (2000). That section provides that a person who "recklessly or with gross negligence causes fire to be communicated to any woods, meadow, marsh, field or prairie, not his own" is guilty of misdemeanor arson. She, however, cites no authority for this argument and overlooks the fact that the evidence in this case shows *only* the arson of a dwelling, and not the setting of any woods, marsh, field, or prairie fires.

¶37. A lesser-included offense instruction should be granted unless the trial judge--and ultimately this Court--can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one

essential element of the principal charge). ***Rowland v. State***, 531 So.2d 627, 631 (Miss. 1988) (citing ***Harper v. State***, 478 So.2d 1017, 1021 (Miss. 1985)). Leedom does not argue that such is the case here. This argument is therefore without merit.

¶38. Leedom argues the court erred in denying the defense instruction on reasonable doubt, which read:

> The Court instructs the Jury that you are bound, in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of the defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when on the whole evidence you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find him/her guilty. You might be able to say that you believe him/her to be guilty, and yet, if you are not able to say on your oaths, beyond reasonable doubt, that he/she is guilty, it is your sworn duty to find the defendant "Not Guilty."

A trial court need not grant an otherwise valid instruction if the subject matter contained in the proposed instruction is adequately covered in another instruction. ***Laney v. State,*** 486 So. 2d 1242, 1246 (Miss. 1986). In the case at bar, no fewer than eight instructions informed the jury of the appropriate standard of proof. Those include instruction C-4:The Court instructs the jury that if the jury, from all the evidence in this case, or from the lack of evidence, has reasonable doubt in their minds as to the guilt of the defendant, then it is you sworn duty to find the defendant not guilty of any charge.

¶39. We find this assignment of error also without merit.

## IX.

¶40. For these reasons, the convictions and sentences are affirmed.

¶41. **COUNT I. CONVICTION OF CONSPIRACY TO COMMIT MURDER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, PURSUANT TO § 99-19-81, AFFIRMED. SENTENCE SHALL RUN CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT II. COUNT II. CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, PURSUANT TO § 99-19-81, AFFIRMED.**

> **PITTMAN, C.J., McRAE, P.J., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

1. Although the prosecution attempted to draft a time-line of events, there is much confusion in the record on the dates of events. The record reflects, in the State's opening argument, that in December of 1994 or 95, approximately one year after Young's death, investigators received a tip from a confidential informant that Leedom had insurance policies on Lula's life, and an investigation of Leedom begun. The defense said at trial, however, that it was two years and two months later after the fire that a confidential informant came forward. In 1997, when trying to tie Leedom to the fire itself, investigators were tipped about Dunn.

2. Dunn testified that the defendant approached him after he killed Young with a request that he kill Stovall.

How long after Young's death, Leedom made this request was not in evidence. An insurance agent, Greg Paylor, testified that after Leedom took out a policy on Young, she later inquired about a policy she wished to take out on Robert Stovall. Whether she made the inquiry before or after Young's death was not in evidence. Young died on December 19, 1994. Another agent, Thomas Cooper, testified that he filed a claim on Young on February 19, 1995, and met with the defendant. He issued a policy on Stovall, who was listed on the application as the defendant's son-in-law, on August 4, 1995. This was within a year's time of Young's death . When Leedom's home was searched in March of 1997, moreover, policies were found for both Stovall and Young.